NORTH CAROLINA TURNPIKE AUTHORITY, AN AGENCY OF THE STATE OF NORTH CAROLINA v. PINE ISLAND, INC., A CORPORATION; W. N. SPRUILL; STATE HIGHWAY COMMISSION, AN AGENCY OF THE STATE OF NORTH CAROLINA; AND THOMAS WADE BRUTON, INDIVIDUALLY, AND AS ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA.

(Filed 23 July, 1965.)

1. Constitutional Law § 7—

The General Assembly may not delegate its supreme legislative power to any other branch of the State Government or agency, but as to specific subject matter it may delegate a limited portion of its legislative power to an administrative agency if it prescribes the standards under which the agency is to exercise the delegated power. Constitution of North Carolina, Art. I, § 8.

2. Same—

The power delegated to the North Carolina Turnpike Authority to select routes is no broader than like power delegated to the State Highway Commission, and the statutes requiring that the Authority select routes with a view to tolls for the payment of its bonds and the integration of toll roads with the State highways, and insuring such integration by requiring approval of the Highway Commission, prescribe sufficient standards for the exercise of the delegated power. G.S. 136-89.59.

3. Same—

The power delegated to the North Carolina Turnpike Authority to fix tolls is required by statute to be exercised with a view to providing revenue sufficient to pay the cost of maintaining and operating its projects and

pay the principal and interest on its bonds, G.S. 136-89.69, and therefore the act prescribes sufficient standards for the exercise of the delegated authority.

**4. Same—**

The power delegated to the North Carolina Turnpike Authority to issue bonds and spend the proceeds thereof is limited by statute to the purpose of constructing and maintaining toll roads as authorized by the statute, G.S. 136-89.62(3), and therefore the statute prescribes sufficient standards for the exercise of the delegated power.

**5. Same—**

The power delegated to the North Carolina Turnpike Authority to determine points of ingress and egress on toll roads must be exercised by the Authority to effectuate the purposes of the act, G.S. 136-89.63(10), and therefore the statute prescribes sufficient standards for the exercise of the delegated authority.

**6. Taxation § 2—**

Since bonds issued by the North Carolina Turnpike Authority are payable by statutory restriction solely from tolls which may be collected from those who elect to use the toll roads, G.S. 136-89.59, such bonds do not constitute a debt of the State within the purview of Art. II, § 14 with regard to the passage of revenue acts, or the purview of Art. V, § 4 in regard to the increase of the public debt.

**7. Statutes § 9—**

If a statute within the power of the General Assembly to enact is objectionable as a local act relating to subjects enumerated in Art. II, § 29, of the Constitution because its scope is limited by a particular section of the act, the repeal of the limiting section validates the act in regard to its future operation.

**8. Statutes § 2—**

Even though a statute creating a turnpike authority limits the authority to the construction, for the time being, of one toll highway, such act is not a local act proscribed by Art. II, § 29, of the State Constitution, since even one toll highway may be of statewide significance in developing and rendering a section of the State accessible to motor traffic.

**9. Highways § 6—**

The North Carolina Turnpike Authority is empowered to construct a toll highway in phases by constructing first a road with only one lane of travel in each direction, with the other lanes and the center division to be constructed later, since the provision of the statute that the authority construct modern, express highways with safety devices including center divisions, etc., G.S. 136-89.59, is not a limitation of its power in this respect, it being contemplated by the statute that the toll roads be constructed in phases since it is provided that bonds for toll roads be authorized and issued from time to time. G.S. 136-89.66.

**10.  Statutes § 5—**

The use of the word "including" in a statutory delegation of authority does not necessarily restrict it to the matters enumerated in the inclusion, and the doctrine of *expressio unius est exclusio alterius* does not ordinarily apply.

APPEAL by defendants Pine Island, Inc. and W. N. Spruill from *Fountain, J.,* in Chambers, 29 December 1964. From CURRITUCK.

This action was instituted by the North Carolina Turnpike Authority (Authority) under the Declaratory Judgment Act, Gen. Stats., ch. 1, art. 26, to determine: (1) the constitutionality of Sess. Laws of 1963, ch. 757, codified as Gen. Stats., ch. 136, art. 6E (the Act); and (2) whether, if the Act is constitutional, Authority can legally construct a turnpike in two phases, the first phase being a two-lane highway with only one lane for traffic in each direction, the second phase, multiple lanes in each direction. Authority is a body politic and corporate created by the Act, which expressly constitutes it a public agency.

The legislative purpose in creating Authority is declared by G.S. 136-89.59 to be "to provide for the construction of modern highways and express highways or superhighways embodying safety devices, including center division, ample shoulder widths, long-sight distances, multiple lanes in each direction and grade separation at intersections with other highways and railroads, and thereby facilitate vehicular traffic, provide better connection between the highway system of North Carolina and the highway systems of the adjoining states, remove many of the present handicaps and hazards on the congested highways in the State and promote the agricultural and industrial development of the State. . . ." To effectuate this purpose, G.S. 136-89.63 empowers Authority, *inter alia:*

"5.  To construct, maintain, repair and operate turnpike projects at such locations within the State as may be determined by the Authority and approved by the State Highway Commission. . . . (N)o turnpike or toll road shall be constructed or operated in this State unless and until a certificate of approval be first obtained from the State Highway Commission certifying that the operation of such toll road or turnpike will not be harmful or injurious to the secondary or primary roads embraced in the system of State highways;

"6.  To issue turnpike revenue bonds of the Authority for any of its corporate purposes, payable solely from the tolls and revenues pledged for their payment, and to refund its bonds, all as provided in this article * * *."

The Act provides that the revenue bonds issued under its grant of power to Authority "shall not be deemed to constitute a debt of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any political subdivision." It requires a statement to this effect on the face of every bond issued. G.S. 136-89.60. From funds acquired under the Act, Authority is empowered to acquire by purchase or condemnation such property of every kind as may be necessary for the construction and operation of any approved project. G.S. 136-89.64. It is also authorized to accept federal grants and, from any source, gifts of land, money, or labor, G.S. 136-89.63(13), as well as "to do all acts and things necessary or convenient to carry out the powers expressly granted in this article," G.S. 136-89.63(14). This latter includes the power "to employ consulting engineer, attorneys, accountants, construction experts, superintendents, managers, and such other employees and agents as may be necessary in its judgment, and to fix their compensation, and to employ financial experts and fiscal agents with the advice and approval of the Local Government Commission; provided, however, that the provisions of G.S. 159-20 shall be complied with to the extent that the same shall be applicable," G.S. 136-89.63(12).

As originally enacted, the Act expressly provided, G.S. 136-89.77, that Authority "shall not construct more than one turnpike project, which project shall not exceed one hundred (100) miles in length, until the General Assembly shall have reviewed the activities of the Authority" and specifically authorized additional projects. On June 16, 1965, by S.B. 532, the General Assembly repealed G.S. 136-89.77 in its entirety.

The facts out of which the controversy arises are undisputed. Admissions in the answer establish them to be as stated in the complaint, which is here summarized:

Authority has determined to construct a turnpike project along the Outer Banks of North Carolina, commencing at or near Duck, Dare County, and extending north through Currituck County, a distance of about 29.30 miles, to a point near the North Carolina-Virginia boundary. The location of the Outer Banks Turnpike has been established, and on October 1, 1964, defendant State Highway Commission duly approved its location and determined that the turnpike would not be injurious to the secondary or primary roads of the State. In compliance with G.S. 136-89.63(5), it issued its certificate to that effect. Authority determined that it would not be economically feasible, in the beginning, to develop and construct the turnpike as a highway with multiple traffic lanes in each direction, but that it would be economically feasible to do so in successive phases. It has therefore provided for the development of the project in two phases, the first to be a two-lane highway providing one traffic lane in each direction, the second, on later deter-

mination of economic feasibility, a four-lane highway providing two traffic lanes in each direction, with a center division.

On or about July 1, 1964, Authority entered into a contract with defendant W. N. Spruill, whereby the latter was employed to serve as Engineering Consultant with respect to the planning and development of the turnpike. This employment is authorized by the Act. His compensation is dependent upon Authority's power to issue and sell its revenue bonds.

Defendant Pine Island, Inc. is the owner of a tract of land, portions of which are embraced within the projected right of way of the proposed turnpike. Pine Island has heretofore conveyed to Authority by deed of gift, dated November 16, 1964, a portion of its lands located within the projected right of way of the turnpike for use only as part of the turnpike. The deed contains a clause whereunder title to such lands will revert in the event the turnpike shall fail to qualify as a "turnpike project" under the Act.

A bona fide controversy exists between plaintiff and defendants Pine Island and Spruill in regard to legal questions, which involve the constitutionality of the Act and the interpretation of certain provisions of it. They contend: (1) that the Act violates N. C. Const., Art. I, § 8; Art. II, § 14; Art. V, § 4; Art. II, § 29; and (2) that the Act does not authorize plaintiff to construct, maintain and operate the proposed turnpike in phases.

The State Highway Commission and the Attorney General were made parties defendant under G.S. 1-260. They, however, contend, with Authority, that the Act is constitutional and authorizes the construction of the turnpike in two phases, as Authority contemplates doing.

After hearing the matter Judge Fountain adjudged that the Act violates no provision of the Constitution of North Carolina and empowers Authority to proceed with the project in two phases, as planned. From his judgment defendants Pine Island and Spruill appeal.

*Poyner, Geraghty, Hartsfield & Townsend for North Carolina Turnpike Authority, plaintiff, appellee.*

*Thomas Wade Bruton, Attorney General, and Harrison Lewis, Assistant Attorney General, for North Carolina State Highway Commission and the Attorney General of North Carolina, defendants, appellees.*

*McLendon, Brim, Holderness & Brooks for Pine Island, Inc. and W. N. Spruill, defendants, appellants.*

SHARP, J. Appellants' challenges to the constitutionality of the Act will be considered *seriatim.*

Appellants' first contention is that, in empowering Authority to determine the need, location, extent, and nature of a turnpike project, and to establish tolls and regulations for its use, the General Assembly delegated its legislative authority without providing sufficient standards for a guide and that the Act therefore violates N. C. Const., Art. I, § 8. This article declares: "The legislative, executive, and supreme judicial powers of the government ought to be forever separate and distinct from each other." Legislative powers are vested, by N. C. Const., Art. II, § 1, in a Senate and a House of Representatives. It is settled and fundamental in our law that the legislature may not abdicate its power to make laws nor delegate its *supreme* legislative power to any other coördinate branch or to any agency which it may create. *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310. It is equally well settled that, as to some *specific* subject matter, it may delegate a *limited* portion of its legislative power to an administrative agency *if* it prescribes the standards under which the agency is to exercise the delegated powers. *In re Annexation Ordinances,* 253 N.C. 637, 117 S.E. 2d 795; *Cox v. Kinston,* 217 N.C. 391, 8 S.E. 2d 252; *Provision Co. v. Daves,* 190 N.C. 7, 128 S.E. 593.

When, in 1951, the Indiana legislature created the Indiana Toll Road Commission and authorized it to construct, maintain, and operate toll projects "at such locations as shall be approved by the Governor, and in accordance with such alignment and design standards as shall be approved by the Highway Commission," the enactment was attacked on the same principles upon which appellants attack the act under consideration here, namely: The Act delegates discretionary duties to administrative officers and bodies without providing reasonable standards for (1) the selection of routes, (2) the fixing of tolls, (3) determining the limit on the borrowing and expenditure of money, and (4) providing points of ingress and egress on the toll-road projects. Under a constitutional provision substantially similar to N. C. Const., Art. I, § 8, and Art. II, § 1, the Indiana court, in *Ennis v. State Highway Commission,* 231 Ind. 311, 108 N.E. 2d 687, held these contentions to be without merit. As to the selection of routes, the court pointed out that the powers delegated to the Toll Road Commission "are no broader than the powers granted to the State Highway Commission in selecting and constructing highways in the State," *Id.* at 326, 108 N.E. 2d at 694; and that, since the turnpike must finance its construction by marketable bonds to be paid by tolls, the locations must be selected with this standard in mind. These observations are as applicable to North Carolina's Turnpike Authority as they were to Indiana's Toll Road Commission. G.S. 136-18(2) authorizes the State Highway Commission "to locate and acquire rights of way for any new roads that

may be necessary for a State highway system. . . ." G.S. 136-45 declares the general purpose of the system to be "highways running to all county seats, and to all principal towns, State parks, and principal State institutions, and linking up with State highways of adjoining states and with national highways into national forest reserves by the most practical routes with special view of development of agriculture, commercial and national resources of the State. . . ." By the Act the legislature authorized turnpike projects to augment the state highway system, G.S. 136-89.59, and insured an integrated system by making such projects subject to the approval of the State Highway Commission. "Exercising its general police powers of the State, the legislature can choose from many different methods to provide for highways." *Dearborn v. Michigan Turnpike Authority,* 344 Mich. 37, 58, 73 N.W. 2d 544, 555. As to the selection of routes, we are of opinion that the General Assembly has set, for the selection of routes, reasonable standards which are as specific as the circumstances permit.

As to toll charges, the legislature authorized Authority to fix and collect tolls for transit over any turnpike project constructed by it. G.S. 136-89.63(7). These tolls are required to be "so fixed and adjusted in respect to the aggregate of tolls from the turnpike project or projects in connection with which the bonds of any issue shall have been issued as to provide a fund sufficient with other revenues, if any, to pay (i) the cost of maintaining, repairing and operating such turnpike project or projects and (ii) the principal of and the interest on such bonds as the same shall become due and payable, and to create reserves for such purposes." G.S. 136-89.68. As the Court said in *Ennis v. State Highway Commission, supra,* with reference to the Indiana act's similar provision regarding tolls charged, "It seems to us that section 14 of the act (tolls) so obviously sets reasonable standards for the fixing of toll charges that a discussion thereof would be idle." *Id.* at 327, 108 N.E. 2d at 695. As a practical matter tolls require little legislative regulation. If they are unreasonably high, motorists will boycott the turnpike; if they are unreasonably low, the bondholders will register their objections in some appropriate manner.

Revenue bonds are authorized only for the purpose of paying the cost of a project. The items embraced in the word *costs,* as applied to a turnpike project, are specifically enumerated in G.S. 136-89.62(3), and the amount of revenue bonds to be issued is limited by the costs as thus defined. Under G.S. 136-89.66, these bonds shall bear interest at a rate not exceeding 6% and shall mature at such time, not exceeding 40 years, as Authority may determine. They must be approved and sold by the Local Government Commission. All funds received pursuant to the Act are, by G.S. 136-89.69, required to be applied "solely as pro-

vided" in the Act. The authority to spend is circumscribed by the authority to do, *i.e.*, to construct and maintain toll roads, to collect the revenues therefrom, and out of them to retire the bonds. Any unrelated expenditures would be illegal. These requirements constitute sufficiently definite standards for both the borrowing and the spending of money.

With reference to points of ingress and egress on the projects, the Act authorizes Authority to establish and control them "as may be necessary or desirable . . . to insure the proper operation and maintenance of such project. . . ." G.S. 136-89.63(10). This could only mean that such points shall be so established as to effectuate the purposes of the Act. G.S. 136-89.59. The legislature could provide no more definite criteria for points of ingress and egress on a road the location of which it has authorized Authority to select. When the City of Dearborn attacked the Michigan Turnpike Act on the ground that it was an unconstitutional delegation of legislative authority, the Michigan court said: "The complexities of modern life are such that courts of last resort have recognized the necessity of legislative grants of authority to carry forward programs such as provided in this Turnpike Act." *Dearborn v. Michigan Turnpike Commission, supra* at 71, 73 N.W. 2d at 561. We also find applicable to the act *sub judice* the reasoning of Francis, J.C.C., in dismissing a similar attack on the constitutionality of powers given the New Jersey Turnpike Authority:

> "In my judgment, it would not be feasible to require more certain standards than those now prescribed. If it were necessary for the Authority to formulate specific plans as to the course of the turnpike through the various municipalities, and as to the manner and method of construction and then seek legislative approval thereof, there would be no purpose in creating the Authority; the Legislature might just as well act itself in the entire matter. The prohibition against abdication of legislative power in favor of an agency was never intended to extend to such administrative details." *City of Newark v. N. J. Turnpike Authority*, 12 N.J. Sup. 523, 536, 79 A. 2d 897, 903.

*Accord*, Opinion of the Justices, 330 Mass. 713, 113 N.E. 2d 452 (act delegating power to Mass. Turnpike Authority held constitutional.)

The second constitutional question presented by this appeal is whether the Act contravenes N. C. Const., Art. II, § 14, which specifies a certain procedure in the General Assembly for the passing of any law raising money on the credit of the State, pledging the faith of the State for the payment of any debt, or imposing any tax on the people of the State. The answer to the second question is, No. Tolls are not taxes. A

person uses a toll road at his option; if he does not use it, he pays no toll.

> "Taxes are levied for the support of government, and their amount is regulated by its necessities. Tolls are the compensation for the use of another's property or improvements made, and their amount is determined by the cost of the property or improvements." *Ennis v. State Highway Commission, supra* at 323, 108 N.E. 2d at 693.

Nor will the credit of the State or any of its municipalities be pledged for the payment of principal or interest on Authority's revenue bonds. These bonds are "payable solely from revenues from the turnpike." G.S. 136-89.59. The General Assembly has taken great care to make it crystal clear that the credit of neither the State nor any of its political subdivisions can be pledged to pay the bonds. G.S. 136-89.60. This method of financing creates no debt within the meaning of the Constitution. *Keeter v. Lake Lure,* 264 N.C. 252, 141 S.E. 2d 634; *Ports Authority v. Trust Co.,* 242 N.C. 416, 88 S.E. 2d 109; *Williamson v. High Point,* 213 N.C. 96, 195 S.E. 90; *Webb v. Port Commission,* 205 N.C. 663, 172 S.E. 377; *Brockenbrough v. Commissioners,* 134 N.C. 1, 46 S.E. 28; *accord, Peo. ex rel Gutknecht v. Port Dist.,* 4 Ill. 2d 363, 123 N.E. 2d 92; *Ennis v. State Highway Commission, supra; Dearborn v. Michigan Turnpike Authority, supra.*

Since the revenue bonds do not create a debt within the meaning of the Constitution, the limitations of N. C. Const., Art. V, § 4, are inapplicable, and appellants' third constitutional contention is likewise without merit. *Ports Authority v. Trust Co., supra.*

For all practical purposes, the repeal of G.S. 136-89.77, which limited Authority to one road not over 100 miles in length "until the General Assembly shall have reviewed the activities of the Authority and shall have authorized additional projects," eliminates appellants' fourth constitutional challenge to the Act. This one is made on the ground that G.S. 136-89.77 gave the Act the character of local legislation so as to violate N. C. Const., Art. II, § 29, which prohibits local legislation authorizing, *inter alia,* the laying out of highways. As heretofore pointed out, the legislature had power, in the first instance, to pass the Act as it now stands with G.S. 136-89.77 deleted. Even had that section rendered the Act local legislation when passed in 1963, the repeal of the section undoubtedly validated the Act in this regard, as to its future operation. *Insurance Co. v. High, Com'r. of Revenue,* 264 N.C. 752, 142 S.E. 2d 681; 16 Am. Jur. 2d, Constitutional Law § 179 (1964). Although plans have been made and approved, no bonds have been issued and no work begun on the Outer Banks project. The Act as passed in

1963 was not, however, local legislation merely because it limited Authority, *for the time being,* to one project. *McIntyre v. Clarkson,* 254 N.C. 510, 119 S.E. 2d 888. One project can well be of State-wide significance. When statutes authorizing a State bridge commission to build a bridge at Port Huron were assailed as local legislation contravening the Michigan constitution, the Michigan court said: "The scope of the act is not limited to an international bridge and ferries at or near Port Huron although it does embrace such objects." *Attorney General v. State Bridge Comm.,* 277 Mich. 373, 378, 269 N.W. 388, 390. The court pointed out that the geography of Michigan requires all its citizens to be particularly interested in transportation across, over, and under the waters of the State, lest they remain without vehicular transportation to the south and to the west. When the Michigan legislature, in its Turnpike Act, asked the Turnpike Authority to study the feasibility of and need for two specifically designated turnpike projects, the Act was held not to violate the Michigan constitution as being local legislation. *Dearborn v. Michigan Turnpike Authority, supra.* Patently North Carolina's act was drafted with the idea of supplementing the Statewide public-highway system. The State Highway Commission is the State agency created for the purpose of constructing and maintaining State-wide highways *at the expense of the entire State.* G.S. 136-45; *Equipment Co. v. Hertz Corp.,* 256 N.C. 277, 123 S.E. 2d 802. The Authority is the State agency created to provide additional roads *at the expense of those who choose to use them.* It is anticipated, however, that these toll roads, when all indebtedness incurred in connection with their construction shall have been paid, will become a part of the State highway system and thereafter be free of toll. G.S. 136-89.74. But, since toll roads are a departure from a legislative policy of many years' standing, in 1963 the General Assembly was proceeding cautiously and experimentally in authorizing them. Even so, it did not direct the location of the pilot project with which it authorized Authority to begin. This was left to the discretion of Authority and State Highway Commission, uncontrolled except by the same general policies which direct location of roads by the State Highway Commission — plus the policy that it must be located in a section where a toll road might reasonably be expected to pay for itself. Although Authority and State Highway Commission could have located it anywhere in the State where it was economically feasible, they located it from the Virginia border southward for 100 miles on North Carolina's Outer Banks, an isolated and a unique geographical asset of the State, a rare tourist attraction. To develop, preserve, and make this section of the State accessible is not simply a local project. In holding constitutional the act creating a port commission to develop port facilities at Morehead City, the Court con-

sidered N. C. Const., Art. II, § 29, although it was primarily concerned with a possible violation of Art. VIII, § 1. *Webb v. Port Commission, supra.* Like the construction of the international bridge at Port Huron, the development of the port at Morehead City was not a local project.

Appellants rely on *Coastal Highway v. Turnpike Authority, supra.* That case is not controlling here. As Denny, J. (now C. J.), pointed out in *In re Annexation Ordinances, supra* at 645, 117 S.E. 2d at 801, the statute under attack in *Coastal Highway* "was held unconstitutional because the General Assembly had not determined the policy of the State with respect to the creation of a municipal corporation to be created by the Municipal Board of Controls for the purpose of constructing and operating a toll road and a toll bridge, and the legislature had further failed to lay down adequate standards for the guidance of such agency when created."

We hold that the Act under consideration here survives the several attacks made upon its constitutionality.

Appellants' final contention is that, even if the Act is constitutional, the legislature has not authorized Authority to proceed with any project in two phases; that a road with only one lane for travel in each direction is not a turnpike within the meaning of the Act, which contemplates the construction of a highway of multiple lanes in each direction, with a center division. This same contention was advanced and rejected in an attack made upon the validity of revenue bonds sold by the West Virginia Turnpike Commission. *Guaranty Trust Co. v. West Virginia Turnpike Commission,* 109 F. Supp. 286 (S.D.W. Va., 1952). There is no substantial difference between the language of the West Virginia act, passed in 1947, and that of ours. The West Virginia legislature created the West Virginia Turnpike Commission "to provide for the construction of modern express highways embodying every known safety device including center division, ample shoulder widths, long-sight distances, the by-passing of cities, multiple lanes in each direction and grade separations at all intersections with other highway and railroads. . . ." W. Va. Sess. Laws of 1947, ch. 139, § 1. The Commission decided to construct a turnpike between a point at the Virginia border south of Princeton, West Virginia, and a point near Charleston, West Virginia, on U. S. Route 60. Because of the high cost of construction through mountains a four-lane highway could not be financed by revenue bonds *in the foreseeable future.* The Commission determined, by resolution, therefore, that it would build the proposed turnpike in phases. The Attorney General of West Virginia argued that the applicable statute limited the Commission's power to the construction of a four-lane highway. Moore, Chief Judge, said:

"The plain language does not admit of this construction. Clearly, by use of the word 'including' the lawmakers intended merely to list examples of known safety devices, but not to exclude others equally well known. Had the latter been their intention, the proper expression to have been used would have been 'comprising,' 'consisting of,' or some synonymous term. This is not a situation which calls for the application of the maxim, *'expressio unius est exclusio alterius.'* * * * If the Commission should find that immediate construction of a four-lane trunpike could be financed by revenue bonds, then the financing and building of an inferior type of roadway might well be deemed an abuse of that discretion. * * * The Act itself contemplates the construction of turnpikes in stages. It provides that bonds may be authorized and issued at one time or from time to time for the payment of any part of the cost of any project." *Id.* at 296, 297.

This statutory construction is equally applicable to our act, which prefaces a listing of turnpike safety devices with the word *including.* "The term 'includes' is ordinarily a word of enlargement and not of limitation. (Citations.) The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions. (Citations.)" *People v. Western Air Lines, Inc.,* 42 Calif. 2d 621, 639, 268 P. 2d 723, 733; *accord, Phelps Dodge Corp. v. N. L. R. B.,* 313 U.S. 177, 189, 85 L. Ed. 1271, 1280, 61 S. Ct. 845, 850. Our act, in G.S. 136-89.66, like the West Virginia act, in W. Va. Sess. Laws of 1947, ch. 139, § 9, provides: "The Authority is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more turnpike projects."

The logic employed by Moore, Chief Judge, is applicable to our act. We hold that Authority is authorized to proceed with the construction of the turnpike project as approved by the resolution of the State Highway Commission dated October 1, 1964.

The judgment of Fountain, J., is in all respects

Affirmed.