TOWN OF SPRUCE PINE, A MUNICIPAL CORPORATION, AND BRYANT ELECTRIC COMPANY, INC., PLAINTIFFS v. AVERY COUNTY AND AVERY COUNTY BOARD OF COMMISSIONERS, CONSISTING OF SUSAN B. PITTMAN, PHYLLIS FORBES, BILL BEUTTELL, ARLENE ELLER, TOMMY BURLESON, INDIVIDUALLY, DEFENDANTS v. THE NORTH CAROLINA ENVIRONMENTAL MANAGEMENT COMMISSION, THE DIVISION OF ENVIRONMENTAL MANAGEMENT OF THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENT, HEALTH AND NATURAL RESOURCES; AND THE DIVISION OF ENVIRONMENTAL HEALTH OF THE NORTH CAROLINA DEPARTMENT OF ENVIRONMENT, HEALTH AND NATURAL RESOURCES, ADDITIONAL DEFENDANTS

No. COA95-639

(Filed 17 September 1996)

**1. Appeal and Error § 443 (NCI4th)— delegation of legislative power—constitutionality—standing to challenge—raised by Court of Appeals**

Although the issue of standing to contest the Water Supply Watershed Protection Act as an unconstitutional delegation of legislative power was not presented by the State agencies, stand-

ing is a question of subject matter jurisdiction which may be raised on the Court's own motion. N.C.G.S. § 143-214.5; N.C.G.S. § 143-214.6; N.C.G.S. § 143-215.6(a).

**Am Jur 2d, Constitutional Law §§ 150-152, 350.**

**Supreme Court's views as to party's standing to assert rights of third persons (jus tertii) in challenging constitutionality of legislation. 40 L. Ed. 2d 902.**

2. **Constitutional Law § 49 (NCI4th)— delegation of legislative power—standing to challenge**

The County had standing to contest the constitutionality of the Water Supply Watershed Protection Act as an unconstitutional delegation of legislative power. For standing in a declaratory judgment action, there must be a present, actual controversy at the time the pleading requesting declaratory relief is filed. Here there was a present, actual controversy when the County's cross-claim for a declaratory judgment was filed since it was asserted as a defensive maneuver in the midst of litigation.

**Am Jur 2d, Constitutional Law § 198.**

**Supreme Court's views as to party's standing to assert rights of third persons (jus tertii) in challenging constitutionality of legislation. 40 L. Ed. 2d 902.**

3. **Environmental Protection, Regulation, and Conservation § 67 (NCI4th); Constitutional Law § 32 (NCI4th)— Water Supply Watershed Protection Act—unconstitutional delegation of legislative power**

Summary judgment should have been granted for the County on its cross-claim against the State agencies for a declaratory judgment that the Water Supply Watershed Protection Act is an unconstitutional delegation of legislative power in violation of Article I, section 6 and Article II, section 1 of the North Carolina Constitution. Although the procedural safeguards of the North Carolina Administrative Procedure Act are adequate, the WSWPA lacks meaningful guiding standards in that it contains a policy statement but no findings and conclusions and the policy statement fails to give any meaningful guidance as to how it should by implemented. The WSPA also fails to define key terms. Absent standards, applicable procedural safeguards alone are not enough.

**Am Jur 2d, Administrative Law § 56.**

**Supreme Court's views as to whether federal statute unconstitutionally delegates Congress' power. 104 L. Ed. 2d 1099.**

Judge GREENE dissenting.

Appeal by defendants from judgment entered 23 June 1994 by Judge Lacy H. Thornburg in Avery County Superior Court and from judgment entered 1 February 1995 by Judge Melzer A. Morgan, Jr. in Caldwell County Superior Court. Heard in the Court of Appeals 28 February 1996.

*Wyatt Early Harris & Wheeler, L.L.P., by Thomas E. Terrell, Jr.; and Lloyd Hise, Jr. for plaintiffs-appellees.*

*Ronald W. Howell, P.A., by Ronald W. Howell; and Joseph W. Seegers, for defendants-appellants.*

*Attorney General Michael F. Easley, by Special Deputy Attorney General Daniel F. McLawhorn, Special Deputy Attorney General Kathryn Jones Cooper, and Assistant Attorney General Sarah Y. Meacham, for additional defendants-appellees.*

LEWIS, Judge.

This appeal requires us to determine the constitutionality of the Water Supply Watershed Protection Act, 1989 N.C. Sess. Laws ch. 426 (codified at N.C. Gen. Stat. sections 143-214.5 and 143-214.6 and amending N.C. Gen. Stat. sections 143-215.2(a) and 143-215.6(a)) (1993) ("WSWPA").

This case had its genesis on 19 March 1993 when an Avery County building inspector refused to grant the Town of Spruce Pine in Mitchell County ("Town") and its contractor, Bryant Electric Company, a building permit to construct a water supply intake in a North Toe River watershed in Avery County. The Town appealed to the Avery County Board of Commissioners which denied the building permit on 9 August 1993. The Town had previously considered placing its intake in Mitchell County, but for various reasons chose to place the intake in Avery County. Placement of the intake in a Avery County watershed triggered the application of the WSWPA and rules promulgated thereunder by the Environmental Management Commission.

## TOWN OF SPRUCE PINE v. AVERY COUNTY

[123 N.C. App. 704 (1996)]

The WSWPA was enacted as an amendment to Article 21 of Chapter 143 of the General Statutes. *See* 1989 N.C. Sess. Laws ch. 426, § 1. Article 21 provides for conservation of our State's water and air resources, *see* N.C. Gen. Stat. section 143-211, and contains statutory provisions that require the Environmental Management Commission ("Commission"), a state agency, to adopt rules implementing these provisions. *See* N.C. Gen. Stat. §§ 143-211 to 143-215.74I (1993). N.C. Gen. Stat. sections 143-214.1 and 143-215.3(a)(1), statutes enacted prior to the WSWPA, require the Commission to classify the waters of the State and to adopt standards appropriate to each classification so as to promote the policies of Article 21 of Chapter 143 of the General Statutes. The Commission has so classified the State's waters in rules found in N.C. Admin. Code tit. 15A, subchapter 2B.

In 1989, the General Assembly enacted the WSWPA in an effort to protect the State's water supply watersheds through imposition of statewide minimum protection requirements. *See* 1989 N.C. Sess. Laws ch. 426. The WSWPA institutes "a cooperative program of water supply watershed management and protection to be administered by local governments consistent with minimum statewide management requirements established by the Commission." G.S. § 143-214.5(a). The WSWPA requires the Commission to adopt rules "for the classification of" the States' water supply watersheds and "that establish minimum statewide water supply watershed protection requirements applicable to each classification to protect surface water supplies . . . ." G.S. § 143-214.5(b).

The WSWPA also permits the Commission to designate certain water supply watersheds or portions thereof as "critical water supply watersheds" and to impose management requirements for these watersheds that are stricter than the minimum statewide requirements. *Id.* The WSWPA further provides that the Commission may reclassify water supply watersheds "as necessary to protect future water supplies or improve protection at existing water supplies." G.S. § 143-214.5(c). The WSWPA creates the Watershed Protection Advisory Council, acting in an advisory capacity, to assist the Commission and the Secretary of the Department of Environment, Health, and Natural Resources in development of the necessary rules and to perform certain other functions deemed appropriate by the Secretary or by the Council itself. G.S. § 143-214.6.

The WSWPA requires local governments to develop water supply watershed protection programs that include a local ordinance

enforcing the minimum statewide management requirements. G.S. § 143-214.5(d). If a local government fails to adopt a complying program, the WSWPA authorizes the Commission to assume responsibility for development and implementation of the local program. G.S. § 143-214.5(e). The WSWPA also authorizes the Commission to take enforcement action against any person who violates a minimum statewide water supply watershed management requirement. G.S. § 143-214.5(f). A local government that fails to adopt the required local program or willfully fails to administer or enforce its program in substantial compliance with the statewide minimum requirements is subject to civil penalties. G.S. § 143-214.5(g). Civil penalties may also be assessed, in areas not covered by an approved local program, against any person who violates the minimum statewide requirements or critical water supply requirements adopted by the Commission. *Id.*

The WSWPA required the Commission to adopt the water supply watershed classifications and applicable management requirements by 1 January 1991 and to complete the classification of all existing water supply watersheds by 1 July 1992. 1989 N.C. Sess. Laws ch. 426, § 5, as amended by 1989 N.C. Sess. Laws ch. 1004, §§ 15, 16, 1989 N.C. Sess. Laws ch. 1024, § 1, and 1991 N.C. Sess. Laws ch. 471, § 1. In accordance with these deadlines, the Commission reclassified over 200 surface water supplies and enacted water supply protection rules effective 3 August 1992.

In 1988, the Town asked the Commission to reclassify the North Toe River, from its headwaters in Avery County to Cathis Creek in Mitchell County, from Class C and C Trout to WS-III and WS-III Trout to reflect its proposed use as a water supply. On 1 January 1990, this section of the North Toe River was reclassified in accordance with then existing statutes and rules. In 1992, the North Toe River Watershed was reclassified WS-III pursuant to the watershed protection rules newly adopted under the WSWPA. This reclassification involved reclassification of the watershed, not just the stream, and included the point of intake upstream of the entire watershed and every stream that drains into it. Pursuant to the requirements of 1995 N.C. Sess. Laws ch. 301, *see* 1995 N.C. Adv. Legis. Serv. 471, the North Toe River water supply watershed has since been reclassified as WS-IV. This reclassification was effective 1 October 1995.

Pursuant to rules that implement the WSWPA, freshwater watersheds are classified as WS-I, WS-II, WS-III, WS-IV, or WS-V with WS-I

being the most protective and WS-V the least protective classification. The WS-III classification, as assigned to the North Toe River water supply watershed in 1992, applies to water supplies which are generally in low to moderately developed watersheds. A WS-IV classification, now currently assigned to the North Toe River water supply watershed, applies to water supplies which are generally in moderately to highly developed watersheds. *See* N.C. Admin. Code tit. 15A, r. 2B.0101, 2B.0211 to 2B.0218 (setting out these classifications and applicable standards).

On 30 July 1993, plaintiffs filed a complaint against defendant Avery County and its Board of Commissioners (hereinafter collectively "County"). On 13 August 1993, the County filed an answer, counterclaim, and a proposed cross-claim against the Commission, and the Division of Environmental Health and the Division of Environmental Management in the Department of Environment, Health and Natural Resources (collectively "the State agencies"). In its counterclaim, the County alleged, *inter alia,* that the Town's selection of an Avery County site for its intake was arbitrary and capricious. By order entered 18 August 1993, Judge Forrest Ferrell allowed the County's motion to add the State agencies as additional defendants. On 18 August 1993, the County filed an amended answer, counterclaim and a cross-claim against the State agencies. By order entered 8 March 1994, the court permitted the County to amend its pleadings again. These amended pleadings were answered by plaintiffs and by the State agencies.

All parties moved for summary judgment on some or all of the claims. By order entered 23 June 1994 in Avery County Superior Court, Judge Lacy H. Thornburg denied plaintiffs' and the County's motions for summary judgment and granted that of the State agencies. By order entered 20 September 1994, the case was transferred to Caldwell County for trial on the only remaining claim, the County's counterclaim against plaintiffs.

After a mistrial, Judge Melzer Morgan, Jr. entered an order on 1 February 1995 granting plaintiffs' renewed motion for directed verdict on the County's counterclaim. The County appeals from this order and from the 23 June 1994 order granting summary judgment to the State agencies on its cross-claim.

In support of its second assignment of error, the County asserts that the trial court erred in directing a verdict against it on its counterclaim against plaintiffs. In its brief, the County asserts that the trial

court erred in declining to submit to a jury the issue of whether plaintiffs' selection of the Avery County site for their water intake was arbitrary and capricious.

Attorneys of record for the County have informed this Court in an Appeal Information Statement that this assignment of error is now moot because the County has agreed to permit plaintiffs to draw water from the Avery County site. Attached to the AIS is a 25 September 1995 letter from the Avery County Board of Commissioners to the County's attorney of record directing that this assignment of error not be pursued.

A case should be dismissed as moot when, in the course of litigation, "it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue." *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979). We dismiss the County's second assignment of error as moot.

[1] In its first assignment of error, the County asserts that the trial court erred by ruling that the WSWPA is constitutional in its order granting summary judgment to the State agencies on the County's crossclaim.

We first examine the State agencies' contention that the County does not have standing to challenge the constitutionality of the WSWPA. The State agencies have not presented this issue by cross-assignment of error or by cross-appeal. However, since standing is a question of subject-matter jurisdiction, we may raise the issue on our own motion. *Union Grove Milling and Manufacturing Co. v. Faw*, 109 N.C. App. 248, 251, 426 S.E.2d 476, 478, *aff'd*, 335 N.C. 165, 436 S.E.2d 131 (1993).

[2] The State agencies rely on *In re Appeal of Martin*, 286 N.C. 66, 209 S.E.2d 766 (1974). In *Martin*, our Supreme Court held that a county did not have standing to challenge the constitutionality of a statute which granted tax exemptions to certain personal property. *Id.* at 76, 209 S.E.2d at 773. *Martin* is distinguishable. There, the constitutional issue was not raised by a declaratory judgment action but in an appeal from an administrative decision. A declaratory judgment action is a proper method to question the constitutionality of a statute. *In re Appeal of Moravian Home, Inc.*, 95 N.C. App. 324, 330, 382 S.E.2d 772, 776, *disc. review denied and appeal dismissed*, 325 N.C. 707, 388 S.E.2d 457 (1989).

N.C. Gen. Stat. section 1-254 (1983) authorizes any "person" whose "rights, status or other legal relations are affected by a statute" to bring a declaratory judgment action. N.C. Gen. Stat. section 1-265 (1983) provides that the word "person" means "any person, . . . or municipal corporation *or other corporation of any character whatsoever*" (emphasis added). Both cities and counties are given corporate powers by statute. *See* N.C. Gen. Stat. § 153A-11 (1991) (counties); N.C. Gen. Stat. § 160A-11 (1994). As it has corporate powers under G.S. section 1-265, we conclude that the County is a "person" under G.S. section 1-254.

Since *Martin*, our Supreme Court has held that a municipality has standing to bring a declaratory judgment action to challenge the constitutionality of a statute which affects its rights or status. *E.g.*, *City of New Bern v. New Bern-Craven Co. Bd. of Ed.*, 328 N.C. 557, 559-60, 402 S.E.2d 623, 625 (1991); *Town of Emerald Isle v. State of N.C.*, 320 N.C. 640, 645-46, 360 S.E.2d 756, 760 (1987). We see no meaningful difference between a city and a county in this context. The WSWPA changes the County's rights and status by requiring it to enact and enforce water supply watershed protection requirements which impose financial and administrative burdens it was not previously required to bear. We conclude that the County is entitled to challenge the constitutionality of legislation which effects this change in its rights and status.

For standing in a declaratory judgment action, there must be a present, actual controversy at the time the pleading requesting declaratory relief is filed. *Sharpe v. Park Newspapers of Lumberton*, 317 N.C. 579, 584, 347 S.E.2d 25, 29 (1986). That is, it must appear that litigation is unavoidable. *Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760. Here, there was a present, actual controversy when the County's cross-claim for a declaratory judgment was filed since it was asserted as a defensive maneuver in the midst of litigation.

For the above reasons, we hold that the County has standing to challenge the constitutionality of the WSWPA.

[3] The dispositive issue in this appeal is whether the WSWPA is an unconstitutional delegation of legislative power to an administrative agency, in this case, the Commission.

Article II, section 1 of the North Carolina Constitution vests legislative power in the General Assembly. N.C. Const. art. II, § 1. Article 1, section 6 of the Constitution provides that the three branches of

government, legislative, executive, and judicial, "shall be forever separate and distinct from each other." N.C. Const. art I, § 6. Our Supreme Court has gleaned from these provisions "the bedrock principle 'that the legislature may not abdicate its power to make laws or delegate its *supreme* legislative power to any coordinate branch or to any agency which it may create.'" *Adams v. Dept. of N.E.R. and Everett v. Dept. of N.E.R.*, 295 N.C. 683, 696, 249 S.E.2d 402, 410 (1978) (quoting *Turnpike Authority v. Pine Island*, 265 N.C. 109, 114, 143 S.E.2d 319, 323 (1965)). Some delegation is inescapable. What and how much are the questions we must answer.

In *Adams*, our Supreme Court set forth the contours of this principle, commonly known as the non-delegation doctrine. Under this doctrine, a legislature <u>may</u> delegate a limited portion of its legislative powers to administrative agencies so that these agencies may exercise their expertise in complex matters with which a legislative body cannot deal directly. *Adams*, 295 N.C. at 697, 249 S.E.2d at 410. However, " 'such transfers of power should be closely monitored' " to insure that agency decision-making is not " 'arbitrary and unreasoned' " and that " 'the agency is not asked to make important policy choices which might just as easily be made by the elected representatives in the legislature.'" *Id.* at 697-98, 249 S.E.2d at 411 (quoting Peter G. Glenn, *The Coastal Management Act in the Courts: A Preliminary Analysis*, 53 N.C.L. Rev. 303, 315 (1974)).

When called upon to do so, our appellate courts have closely monitored legislative delegations and have held them unconstitutional when these principles have been violated. *E.g. Northampton County Drainage District Number One v. Bailey*, 326 N.C. 742, 392 S.E.2d 352 (1990); *Watch Co. v. Brand Distributors and Watch Co. v. Motor Market*, 285 N.C. 467, 206 S.E.2d 141 (1974); *State v. Williams*, 253 N.C. 337, 117 S.E.2d 444 (1960); *Harvell v. Scheidt, Comr. of Motor Vehicles*, 249 N.C. 699, 107 S.E.2d 549 (1959); *Taylor v. Racing Asso.*, 241 N.C. 80, 84 S.E.2d 390 (1954); *Coastal Highway v. Turnpike Authority*, 237 N.C. 52, 74 S.E.2d 310 (1953); *Board of Trade v. Tobacco Co.*, 235 N.C. 737, 71 S.E.2d 21, *cert. denied*, 344 U.S. 866, 97 L. Ed. 671 (1952); *State v. Harris*, 216 N.C. 746, 6 S.E.2d 854 (1940); *Church v. State*, 40 N.C. App. 429, 253 S.E.2d 473 (1979), *aff'd*, 299 N.C. 399, 263 S.E.2d 726 (1980); *Drug Centers v. Board of Pharmacy*, 21 N.C. App. 156, 204 S.E.2d 38 (1974).

The critical question for our determination is whether the challenged delegation is accompanied by adequate guiding standards. *See*

*In re Community Association,* 300 N.C. 267, 273, 266 S.E.2d 645, 650 (1980). If such standards are present, the delegation is constitutional. *Adams,* 295 N.C. at 697, 249 S.E.2d at 410. The primary sources for these guiding standards are "declarations by the General Assembly of the legislative goals and policies" to be applied by an agency in exercising its delegated powers. *Adams,* 295 N.C. at 698, 249 S.E.2d at 411. To be adequate, the guiding standards must be " 'as specific as the circumstances permit.' " *Id.* (quoting *Turnpike Authority,* 265 N.C. at 115, 143 S.E.2d at 323).

In *Adams,* the Court held that the Coastal Area Management Act of 1974, N.C. Gen. Stat. section 113A-100, *et. seq.* (1994) ("CAMA"), contained adequate guiding standards as expressed in the CAMA's legislative goals and findings and in the CAMA criteria for designating Areas of Environmental Concern. *Id.* at 698-700, 249 S.E.2d at 411-12.

In stark contrast to CAMA, the WSWPA contains no findings and goals. It does contain a policy statement. However, this statement fails to give any meaningful guidance as to how it should be implemented. The WSWPA policy statement provides:

(a) Policy Statement.—This section provides for a cooperative program of water supply watershed management and protection to be administered by local governments consistent with minimum statewide management requirements established by the Commission. If a local government fails to adopt a water supply watershed protection program or does not adequately carry out its responsibility to enforce the minimum water supply watershed management requirements of its approved program, the Commission shall administer and enforce the minimum statewide requirements. The reduction of agricultural nonpoint source discharges shall be accomplished primarily through the Agriculture Cost Share Program for Nonpoint Source Pollution Control.

G.S. § 143-214.5(a).

The WSWPA directs the Commission to adopt rules

for the classification of water supply watersheds and that establish minimum statewide water supply watershed protection requirements applicable to each classification to protect surface water supplies by (i) controlling development density, (ii) providing for performance-based alternatives to development density controls that are based on sound engineering principles, or (iii) a combination of (i) and (ii).

G.S. § 143-214.5(b). Although the WSWPA designates two methods (methods (i) and (ii) above) to be used by the Commission in developing minimum statewide management requirements, it does not delineate the policy considerations that should guide the Commission in adopting these minimum requirements. It also fails to set forth any criteria for classification of watersheds.

The WSWPA further permits the Commission to designate some water supply watersheds as "critical water supply watersheds" and to impose more stringent management requirements on these watersheds. G.S. § 143-214.5(b). However, it provides no criteria for the Commission to follow in its designation of these critical water supply watersheds. *See id.* As discussed in *Adams,* 295 N.C. at 700, 249 S.E.2d at 412, such criteria are provided in the CAMA to guide the Coastal Resources Commission in its designation of Areas of Environmental Concern. *See* N.C.Gen. Stat. § 113A-113 (1994). For a comprehensive discussion of the constitutional infirmities of the WSWPA, *see* Brandon Bordeaux, Comment, *Legal Analysis of the Constitutionality of the Water Supply Watershed Protection Act of 1989 and the Hyde Bill,* 29 Wake Forest L. Rev. 1279 (1994).

The WSWPA also fails to define several of its key terms. The applicable definitions set forth in N.C. Gen. Stat. section 143-213 (1993) do not fill in these definitional gaps. Although the term "watershed" is defined in G.S. section 143-213(21), many other WSWPA key terms are not defined in G.S. section 143-213 or in the WSWPA. These include "water supply," "critical water supply watershed," and "performance-based alternatives to development density controls." *See* G.S. § 143-214.5 (using but not defining these terms).

The State agencies assert that the General Assembly's decision to enact the WSWPA as an amendment to Article 21 of Chapter 143 reveals its intent that the Commission implement the WSWPA (1) in light of the public policy declaration set forth in N.C. Gen. Stat. section 143-211 (1993) and (2) by use of the criteria for classification of our State waters and the criteria for setting water quality standards set forth in N.C. Gen. Stat. section 143-214.1 (1993). The State agencies contend that, when read *in pari materia* with these complementary provisions, the WSWPA is constitutional. We are not persuaded.

The general policy statement in G.S. section 143-211 declares it to be the public policy of the State "to provide for the conservation of its water and air resources" and states that "it is the intent of the General

Assembly," within the context of Articles 21, 21A, and 21A of Chapter 143, "to achieve and to maintain . . . a total environment of superior quality." G.S. § 143-211. While stating this preference for a "superior quality" environment, this policy statement also sets forth a kaleidoscope of concerns that should be addressed by water and air purity standards without delineating a preferred balance to be maintained by the implementing agency in accommodating these frequently antithetical interests, *to wit*:

> . . . Standards of water and air purity shall be designed to protect human health, to prevent injury to plant and animal life, to prevent damage to public and private property, to insure the continued enjoyment of the natural attractions of the State, to encourage the expansion of employment opportunities, to provide a permanent foundation for healthy industrial development and to secure for the people of North Carolina, now and in the future, the beneficial uses of these great natural resources.

G.S. § 143-211.

In *State ex rel. Utilities Commission v. Empire Power Co.*, 112 N.C. App. 265, 435 S.E.2d 553 (1993), *disc. review denied*, 335 N.C. 564, 441 S.E.2d 125 (1994), we addressed the constitutionality of a legislative delegation of power to the Utilities Commission. This delegation empowered the Commission to dismiss an application for a certificate of public convenience and necessity, a certificate required for construction of the proposed electric generating facility. *See id.* at 270-71, 435 S.E.2d at 555-56. In holding the delegation constitutional, we read the standard of public convenience and necessity set forth in the challenged legislation, N.C. Gen. Stat. section 62-110.1, *in pari materia* with N.C. Gen. Stat. section 62-2, a section that, at the time, set forth ten specific policies to guide the Utilities Commission in exercising its powers under Chapter 62. *Id.* at 274, 435 S.E.2d at 557.

In *Empire Power*, the policies set forth in G.S. section 62-2 complemented a specific standard in the challenged legislation, the standard of public convenience and necessity. *See id*; Bordeaux, *supra*, at 1296-1297. In contrast, the WSWPA does not contain an analogous specific standard that may be complemented by the policies set forth in G.S. section 143-211, the section that contains the general policy statement for Article 21. Bordeaux, *supra*, at 1297. In other words, even if we read the WSWPA provisions *in pari materia* with G.S. section 143-211, the WSWPA still lacks adequate guiding standards. The

policy provisions in G.S. section 143-211 alone simply do not redeem the broadside policy declarations of the WSWPA.

There is also no indication in the WSWPA that the General Assembly intended for the Commission, in implementing the WSWPA, to use the more detailed criteria for classification of our State waters and the criteria for water quality standards set forth in N.C. Gen. Stat. section 143-214.1. If the General Assembly had such an intention, it could easily have referenced this section in the WSWPA. It did not.

In essence, the General Assembly declined to make hard policy choices and instead, left them for the Commission to decide. The policy statements and other guiding provisions of the WSWPA are simply not " 'as specific as the circumstances permit.' " *See Adams*, 295 N.C. at 698, 249 S.E.2d at 411 (quoting *Turnpike*, 265 N.C. at 115, 143 S.E.2d at 323). For instance, the General Assembly declined to designate the desired balance between development and watershed protection or to specify the degree and type of protection sought by use of watershed classifications. Thereby it gave significant policy decisions to the Commission and so abdicated its responsibility to make these choices openly in the crucible of public debate and political compromise.

In *Adams*, our Supreme Court also recognized that the presence or absence of procedural safeguards to arbitrary agency action is relevant to a determination of whether a delegation is constitutional. *Adams*, 295 N.C. at 698, 249 S.E.2d at 411. There are significant procedural safeguards in the WSWPA itself. In addition, the N.C. Administrative Procedure Act ("NCAPA"), Chapter 150B of the General Statutes, governs the adoption and publication of rules under the WSWPA. *See* N.C. Gen. Stat. § 143-214.1(e) (1993). We must read the provisions of the NCAPA as complementing the procedural safeguards present in the WSWPA as the Court did *Adams* in regard to the CAMA. *See Adams*, 295 N.C. at 702, 249 S.E.2d at 413. Taken together, we conclude that these procedural safeguards are adequate. However, as discussed above, the WSWPA lacks meaningful guiding standards. Absent such standards, we further conclude that the applicable procedural safeguards alone are not enough to convert the WSWPA into a lawful delegation of legislative power.

In sum, we conclude that the WSWPA is an unconstitutional delegation of legislative power in violation of Article I, section 6 and Article II, section 1 of the North Carolina Constitution.

The County also asserts that the WSWPA violates the law of the land clause in Article I, Section 19, of the North Carolina Constitution and that the Hyde Amendment to the WSWPA, 1993 N.C. Session Laws ch. 520, violates its right to equal protection of the law. Since we have found the WSWPA unconstitutional in its entirety on other grounds, we need not address these additional constitutional arguments.

The order granting summary judgment to the State agencies on the County's cross-claim is reversed and the case is remanded to the trial court for entry of summary judgment for the County on its cross-claim against the State agencies for a declaratory judgment that the WSWPA is unconstitutional.

Judge SMITH concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

I disagree with the majority's holding that the WSWPA is an unconstitutional delegation of legislative power because it "lacks meaningful guiding standards." A statute enacted by the General Assembly is presumed to be constitutional, *Wayne County Citizens Ass'n v. Wayne County Bd. of Comm'rs*, 328 N.C. 24, 29, 399 S.E.2d 311, 314-15 (1991), and the burden is on the person challenging the statute to show it is unconstitutional. *Mobile Home Sales v. Tomlinson*, 276 N.C. 661, 669, 174 S.E.2d 542, 548 (1970).

As stated in *Adams v. Department of N.E.R. and Everett v. Department of N.E.R.*, 295 N.C. 683, 249 S.E.2d 402 (1978), in proper instances a "modern legislature" must be able to delegate " 'a *limited* portion of its legislative powers [sic]' to administrative bodies which are equipped to adapt legislation 'to complex conditions involving numerous details with which the Legislature cannot deal directly.' " *Id.* at 697, 249 S.E.2d at 410 (quoting *Turnpike Auth. v. Pine Island*, 265 N.C. 109, 114, 143 S.E.2d 319, 323 (1965); *Coastal Highway v. Turnpike Auth.*, 237 N.C. 52, 60, 74 S.E.2d 310, 316 (1953)). Such delegation must be accompanied by "adequate guiding standards" that "need be only 'as specific as the circumstances permit.' " *Id.* at 698, 249 S.E.2d at 411 (quoting *Pine Island*, 265 N.C. at 115, 143 S.E.2d at 323). Furthermore,

[w]hen there is an obvious need for expertise in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation. It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances.

*Id.*

In a complex society "replete with ever changing and more technical problems, [the General Assembly] simply cannot do its job absent an ability to delegate power under broad general directives." I Kenneth Culp Davis and Richard J. Pierce, Jr., *Administrative Law Treatise* § 2.6, at 66 (3d ed. 1994); *see* 1 Jacob A. Stein, et al., *Administrative Law* § 3.03[4], at 3-96 (1993) ("the delegation doctrine has not invalidated legislation predicated on the vaguest of standards, even when the legislation's standards are virtually nonexistent"). Our Supreme Court has stated that "[d]etailed standards are not required" and the "modern tendency is to be more liberal in permitting grants of discretion to administrative agencies . . . to ease the administration of laws as the complexity of economic and governmental conditions increases." *Commissioner of Ins. v. Rate Bureau*, 300 N.C. 381, 402, 269 S.E.2d 547, 563, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 300 (1980).

The WSWPA's "Policy Statement" states that the statute "provides for a cooperative program of water supply watershed management and protection." N.C.G.S. § 143-214.5(a) (1993). Furthermore, the statute mandates that the Environmental Management Commission (Commission) "shall adopt rules for the classification of water supply watersheds" designed to "protect surface water supplies by (i) controlling development density, (ii) providing for performance-based alternatives to development density controls that are based on sound engineering principles, or (iii) a combination of both (i) and (ii)." N.C.G.S. § 143-214.5(a), (b). The question is whether these guidelines are adequate.

The Commission, authorized to implement the WSWPA, was created to "promulgate rules" to protect, preserve, and enhance North Carolina's water and air resources. N.C.G.S. § 143B-282(a) (1993). Before enacting the WSWPA, North Carolina used a different

water classification system which was also designed to protect water supplies and which the Commission controlled and implemented. *See* Brandon Bordeaux, Comment, *Legal Analysis of the Constitutionality of the Water Supply Watershed Protection Act of 1989 and the Hyde Bill*, 29 Wake Forest L. Rev. 1279, 1283-84 (1994). Based on its prior work classifying water supplies, the Commission has the experience and knowledge to design and implement a water supply watershed classification system without detailed findings and requirements from the General Assembly. Furthermore, the WSWPA must be read in the context of Article 21, titled "Water and Air Resources," to which it is an amendment and which concerns itself with the protection, preservation and enhancement of our water and air resources. Article 21 sets out a declaration of public policy, including the achievement and maintenance of a "total environment of superior quality." N.C.G.S. § 143-211 (1993). In fulfilling its duties, the Commission has the responsibility of preserving and developing the State's natural resources "in the best interest of all its citizens." *Id.* This standard applies to the Commission's duty of protecting North Carolina's air and water resources, part of which includes the job of classifying water supply watersheds.

Although the WSWPA does not have detailed guiding standards, such detail is not necessary. The General Assembly has articulated guiding standards that are as "specific as the circumstances permit" and I would hold the WSWPA to be a constitutional delegation of legislative powers. I would therefore affirm the order of the trial court granting summary judgment to the State agencies on the County's cross-claim.