S&M Brands, Inc. v. Stein, 2020 NCBC 23.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 6894

S&M BRANDS, INC.,

        Plaintiff,

v.

JOSH STEIN, in his official capacity
as the Attorney General of the State
of North Carolina, and the STATE
OF NORTH CAROLINA,

        Defendants.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion," ECF No. 122), and Defendants' Motion for Summary Judgment ("Defendants' Motion," ECF No. 117) (collectively, the "Summary Judgment Motions").

THE COURT, having considered the Summary Judgment Motions, the evidentiary materials and briefs filed in support of and in opposition to the Summary Judgment Motions, the arguments of counsel at the hearing, the applicable law, and other appropriate matters of record, CONCLUDES, that the Plaintiff's Motion should be GRANTED, in part, and DENIED, in part, and that the Defendants' Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

> *Troutman Sanders LLP, by Christopher G. Browning, Jr. and Bryan M. Hayne,s for Plaintiff S&M Brands, Inc.*
>
> *The North Carolina Department of Justice, by Gary D. Wilson, Lauren M. Clemmons, and Laura H. McHenry, for Defendants Josh Stein and the State of North Carolina.*

McGuire, Judge.

## I.     FACTS AND PROCEDURAL BACKGROUND

1.     "The Court does not make findings of fact when ruling upon a motion for summary judgment. But to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

### A.     The Parties

2.     At all times relevant to this action, Plaintiff S&M Brands, Inc. ("Plaintiff") was a small, regional manufacturer of tobacco products, including cigarettes, based in Keysville, Virginia. Plaintiff sold its products primarily in the southeastern United States, including North Carolina. On or about March 7, 2019, Plaintiff sold its cigarette business and ceased manufacturing cigarettes. (*See* ECF No. 100.) The sale did not include any rights or other interests in Plaintiff's escrow account payments that are at issue in this lawsuit. (ECF No. 108, at p. 3 n.2.) Plaintiff has confirmed that it "does not, at this time, intend to sell cigarettes to distributors and retailers for resale in North Carolina on or after May 1, 2019." (Plaintiff's Objections and Responses to Defendants' Discovery Requests in Reopened Discovery, ECF No. 111.3 at Exhibit 3, p. 4.)

3.     Defendant Josh Stein is the Attorney General of Defendant State of North Carolina ("Attorney General"; collectively, Josh Stein and the State of North Carolina are "Defendants"). Plaintiff alleges that at all times, Stein acted under color

of State authority and sues Stein only in his official capacity. (ECF No. 36, at ¶¶ 13–14.)

## B.     The Master Settlement Agreement

4.      In or around 1994, numerous states sued the then existing four major tobacco companies—Philip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard ("Big Four")—alleging that they had deceived the public about the dangers of smoking cigarettes and had engaged in other unlawful conduct designed to mislead consumers. (*Id.* at ¶¶ 21–24.) The lawsuit made claims for, *inter alia*, antitrust, fraud, racketeering, and conspiracy.  (*Id.*)

5.      In November 1998, forty-six states, including North Carolina and the District of Columbia and five United States territories (the "MSA States") settled the lawsuit with the Big Four.  (*Id.* at ¶ 26.)  Four states (Florida, Minnesota, Mississippi, and Texas) had previously settled separately with the Big Four.  (*Id.*)

6.      Effective November 23, 1998, the Big Four and the MSA States executed a Master Settlement Agreement (the "MSA"). (Master Settlement Agreement, ECF No. 36.1–36.3; hereinafter referred and cited to as "MSA" followed by a section number.) Under the terms of the MSA, the Big Four (in the MSA, the Big Four are for some purposes referred to as the "Original Participating Manufacturers" and will hereinafter in this Order be referred to collectively as the "OPMs") agreed to make annual settlement payments to the Settling States in perpetuity. The settlement payments are first made into a national escrow fund and are then distributed to the Settling States according to each state's "allocable share" of the payments as set forth

in the MSA ("Allocable Share"). The settlement payments made by the OPMs are determined by the OPMs' respective shares of the cigarette market in the United States, the District of Columbia, and Puerto Rico (defined in the MSA as "Market Share") during a sales year.[1] In other words, to the extent an OPM increases its Market Share in a given year, its settlement payment obligation increases. (ECF No. 36, at ¶ 33.) The revenues generated from the OPMs' sales, however, are not considered in determining their payment obligations. (*Id.*) Plaintiff alleges that under this method, the OPMs are discouraged from "trying to increase revenue by lowering prices" because increasing sales, and thus Market Share, would cause higher settlement payments. (*Id.*) Instead, Plaintiff alleges that the MSA payment scheme encourages the OPMs to raise prices as a means of increasing revenue without increasing Market Share. (*Id.*)

7.      In the MSA, the OPMs also agreed to substantial restrictions on their marketing, advertising, lobbying, and trade association activities. Additionally, the OPMs agreed to relinquish any challenges to state laws and rules regarding tobacco. (*Id.* at ¶ 34.) In exchange, the MSA States released the OPMs from certain claims arising out of the OPM's past conduct.

8.      The MSA permits cigarette manufacturers who were not sued by the MSA States to voluntarily sign the MSA along with the OPMs. Manufacturers who signed the MSA after the OPMs are known as "Subsequent Participating

---

[1] As used herein, the term "sales year" refers to the calendar year in which the tobacco manufacturer sold the cigarettes for which they are required to make a payment. The term "payment year" refers to the year following the sales year in which the manufacturer is required to make the payment by April 15.

Manufacturers" ("SPMs"). SPMs are bound by the same payment obligations, in perpetuity, and the same restrictions on their activities, as the OPMs (collectively, the OPMs and SPMs are referred to as the "Participating Manufacturers" ("PMs")). As an incentive for cigarette manufacturers to voluntarily join the MSA, the MSA provides that SPMs that signed the MSA within ninety days[2] of the MSA's execution *and* had a Market Share of cigarette sales in 1997 or 1998 were "grandfathered" under the MSA, and are only required to make settlement payments to the extent that the SPM's Market Share for a given year exceeds its 1998 Market Share or 125% of its 1997 Market Share. (MSA § IX(i).) If the SPM either signed the MSA more than ninety days after the MSA's execution or had no Market Share in 1997 or 1998, that SPM must make yearly payments based on its Market Share for the year at issue without the benefit of subtracting a grandfathered Market Share. Section IX(i) of the MSA provides in relevant part as follows:

> (1)   A Subsequent Participating Manufacturer shall have payment obligations under this Agreement only in the event that its Market Share in any calendar year exceeds the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share (subject to the provisions of subsection (i)(4)).
>
> . . .
>
> (4)   For purposes of this subsection (i), the 1997 (or 1998, as applicable) Market Share (and 125 percent thereof) of those Subsequent Participating Manufacturers that either (A)  became a signatory to this Agreement more than 90 days after the MSA Execution Date or (B) had no Market Share in 1997 (or 1998, as applicable), shall equal zero.

---

[2] The period was changed from sixty to ninety days via an amendment to the MSA. (ECF No. 44, at Ex. 11.)

(MSA § IX(i)(1), (4).)

9. As of October 2019, there were more than 60 PMs listed as participants in the MSA. *See Participating Manufacturers under the Master Settlement Agreement*, NATIONAL ASSOCIATION OF ATTORNEYS GENERAL (Oct. 4, 2019), https://www.naag.org/assets/redesign/files/msa-tobacco/2019-10-04%20PM%20List%20.pdf.

10. The payments due from the PMs are calculated each year by an Independent Auditor selected by the MSA States and OPMs. (MSA § XI(a).) It is undisputed that PriceWaterhouseCoopers LLP ("PwC") has acted as the Independent Auditor under the MSA. PwC "calculate[s] and determine[s] the amount of all payments owed pursuant to [the MSA]," including all "adjustments, reductions and offsets . . . ." (*Id.*) Payments are due from the PMs on April 15 every year. PwC is required to provide each PM with a "Preliminary Calculation" of the amount due from the PM forty days prior to April 15, and a "Final Calculation" fifteen days before April 15. (MSA §§ XI(d)(2), (4); Dep. of PwC, ECF No. 121.1, at Ex. G [SEALED].) The PMs are provided an opportunity to dispute the Preliminary Calculation made by PWC. Nevertheless, by April 15 of a payment year, a PM must pay the undisputed portion of the Final Calculation. (MSA § XI(d)(7).) The PM may either withhold the disputed portion of the Final Calculation or may pay the disputed portion into a Disputed Payments Account until final determination of its payment obligation. (MSA § XI(d)(8).) To the extent it is determined that the PM owed the disputed

portion, the PM is not liable for the interest on the disputed payment that it pays into a Disputed Payments Account. (*Id.*)

11. The Final Calculations, however, are subject to revision by PwC. ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ (ECF No. 121.1, at Ex. G [SEALED].) If a PM disputes PwC's Final Calculation, the dispute must be resolved by binding arbitration before a panel of three arbitrators. (MSA § XI(c).) It is undisputed that it can take many years for a final determination of all disputed payments to occur.

## C. NPMs and the NC Qualifying Statute

12. Cigarette manufacturers who were not sued by the Settling States and who chose not to voluntarily sign the MSA are called "Non-Participating Manufacturers" ("NPMs"). (MSA § II(cc).) NPMs are not required to make payments under the MSA and are not subject to the restrictions placed on the PMs. Although invited to do so, Plaintiff chose not to sign the MSA and is an NPM. (ECF No. 119.4, at Ex. 5 [SEALED].)

13. In order to prevent NPMs from having a competitive advantage over the PMs, due to the substantial settlement payments the PMs are required to make, the MSA contained incentives for the Settling States to enact a "Qualifying Statute." (MSA § IX(d)(2)(E).) The "Qualifying Statute" was designed to "effectively and fully neutralize[] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of

the provisions of [the MSA]." (*Id.*) The MSA included, as an exhibit, a model Qualifying Statute that would satisfy the terms of the MSA. (MSA, at Ex. T.) In July 1999, North Carolina enacted a Qualifying Statute (the "NC Qualifying Statute") based on the model Qualifying Statute. N.C.G.S. §§ 66-290–294.2 (2019).

14. The NC Qualifying Statute requires NPMs selling cigarettes in North Carolina to pay a statutorily-prescribed annual amount into a "qualified escrow fund" ("Escrow Fund"). N.C.G.S. § 66-291(a)(2). Each NPM establishes its own individual Escrow Fund. An NPM's payment is calculated based on a set amount paid for each cigarette sold in North Carolina during the sales year.[3] *Id.* The NPMs hold the funds in their Escrow Fund for the benefit of North Carolina and the funds are available to satisfy judgments or settlements between the NPM and the MSA States for certain claims that may arise from the manufacturer's cigarette products. Escrow Fund deposits are invested in U.S. Government Treasury Bills and other securities which pay out interest income. The NPM receives any interest or appreciation on the amounts held in its Escrow Fund. Otherwise, the amounts held in the Escrow Fund can only be released: (1) to pay a judgment or settlement on certain claims by the MSA States against the NPM; (2) to release to the NPM any overpayments into its Escrow Fund; or (3) to revert back to the NPM twenty-five years after the specific funds were paid into the Escrow Fund. N.C.G.S. § 66-291(b). The Attorney General is charged with administration of the NC Qualifying Statute. (ECF No. 36, at ¶ 63.)

---

[3] The NPM is required to make their full escrow payment for a sales year by April 15 of the following year ("payment year").

15. With regard to the release for overpayments by an NPM into its Escrow Fund, the NC Qualifying Statute, as originally enacted, provided in relevant part as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement (as determined pursuant to section IX(i)(2) of the Master Settlement Agreement, and before any of the adjustments or offsets described in section IX(i)(3) of that Agreement other than the Inflation Adjustment) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer[.]

N.C.G.S. § 66-291(b)(2) (1999). Under N.C.G.S. § 66-291(b)(2), as originally enacted, an NPM could receive a release of funds from its Escrow Fund if it could establish that the amount it was required to deposit on its North Carolina sales in a particular year exceeded North Carolina's 2.3322850% Allocable Share (MSA, at Ex. A) of the hypothetical MSA payment the NPM would have been required to make on its nationwide sales in that year. Under this formula, Defendants claim, and Plaintiff does not dispute, that "an NPM that, for example, had 23.3% of its nationwide sales in North Carolina could seek and obtain a release of 90% of its required escrow deposit" based on North Carolina's Allocable Share of approximately 2.33%. (ECF No. 129.1, at pp. 8–9.)

16. In fact, Plaintiff utilized the original language of N.C.G.S. § 66-291(b)(2) to obtain releases from its Escrow Fund on payments made for the years 1999-2005

█████████████, or almost ████ of Plaintiff's ████████ required escrow payments for those years.

17. Effective January 1, 2006, N.C.G.S. § 66-291(b)(2) was amended to read as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the State in a particular year was greater than the Master Settlement Agreement payments, as determined pursuant to Section IX(i) of that agreement, including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer[.]

N.C.G.S. § 66-291(b)(2) (the "2005 Amendment").

18. In other words, under the amended N.C.G.S. § 66-291(b)(2), an NPM can obtain a release of overpayments into its Escrow Fund only if it can establish that the amount it paid for a sales year exceeds what the NPM would have been required to pay based on the hypothetical amount a SPM would have been required to pay, as calculated under Section IX(i) of the MSA, based on selling the same number of cigarettes in North Carolina during that sales year.

**D.     The NPM Adjustment**s

19. A PM's annual MSA settlement payment is subject to various adjustments, including the "NPM Adjustment." (MSA § IX(d)(1), (4), (i)(3).) If the PMs experience an aggregate Market Share loss of more than two percentage points in a given sales year—relative to their 1997 aggregate Market Share—then they may

receive an "NPM Adjustment," reducing their payment obligation for that sales year, consistent with the formula in MSA § IX(d)(1)(A). In order to get an NPM Adjustment, a nationally recognized economic consulting firm must determine that the MSA was a "significant factor contributing to the Market Share Loss for the year in question." (MSA § IX(d)(1)(C).) OPMs' shares of the available NPM Adjustment are calculated as provided under MSA § IX(d)(3)(B), and SPMs will similarly be entitled to an NPM Adjustment consistent with MSA §§ IX(d)(4) and (i)(3).

20.     If PMs receive a reduction in their payment obligations because of an NPM Adjustment, the reduced payments are allocated among the amounts due to each of the MSA States unless "such [ ] State continuously had a Qualifying Statute . . . in full force and effect during" the pertinent sales year "and diligently enforced the provisions of such statute during such entire calendar year." (MSA §§ IX(d)(2)(A), (B).) A MSA State that diligently enforced its Qualifying Statute would be exempt from the NPM Adjustment, and the NPM Adjustment's reduction to MSA revenues would be borne by the non-exempt MSA States according to their respective Allocable Shares. (MSA § IX(d)(2)(C).)

21.     PMs can dispute the NPM Adjustment determinations made by the economic consultants by filing for arbitration for a given sales year. However, the arbitration process has proven to be cumbersome, and the NPM arbitration for sales year 2004 has not yet been concluded as of the date of this Order. There are likely to be NPM arbitrations initiated for sales years 2005 through 2019. Defendants do not

dispute that the arbitration process for a given sales year takes many, many years to complete.

22.     Nevertheless, over the years the PMs and some of the MSA States have been able to resolve their disputes over NPM Adjustments for certain sales years. In December 2012, it was announced that the PMs and nineteen MSA States, including North Carolina, settled certain disputes. The terms of the settlement were reflected in a "Term Sheet," covering NPM Adjustments pertaining to sales years 2003–12 and subsequent years ("2012 Term Sheet"). (ECF No. 44, at Ex. 7.) By the fall of 2017, twenty-six MSA States had become parties to the Term Sheet, "in order to avoid the further expense, delay, inconvenience, burden and uncertainty of continued disputes with respect to the applicability of such NPM Adjustments." (2017 NPM Adjustment Settlement Agreement, ECF No. 72, at § I; subsequent joinders thereto, ECF Nos. 73–74; ECF No. 122.1, at Ex. D; ECF No. 130, at Ex. D.) The 2017 NPM Adjustment Settlement Agreement was "a comprehensive final settlement agreement incorporating the terms of that Term Sheet." (ECF No. 72, at § I.) The Attorney General issued a press release titled "North Carolina Tobacco Settlement Payment Dispute Finalized." N.C. DEP'T OF JUSTICE (Nov. 9, 2017), https://ncdoj.gov/north-carolina-tobacco-settlement-payment-dispute/.

23.     In 2018, ten additional MSA States joined the 2017 NPM Adjustment Settlement Agreement. (AGs' Cover Letters to Joinder Agreements, ECF No. 127, at Ex. D [SEALED]; ECF No. 122.1, at Ex. D.) In 2018, PMs and the States (including North Carolina) that are parties to the 2017 NPM Adjustment Settlement Agreement

also entered into a "2016 and 2017 NPM Adjustments Settlement Agreement." (ECF No. 127, at Ex. E [SEALED]; ECF No. 122.1, at Ex. E.)

24. Additionally, in 2015 the State of New York entered into a separate NPM Adjustment settlement agreement with the PMs. (New York NPM Adjustment Settlement Agreement, https://tinyurl.com/y64cq5s8) (collectively, the 2012 Term Sheet, 2017 NPM Adjustment Settlement Agreement, 2016 and 2017 NPM Adjustments Settlement Agreement, and the New York NPM Adjustment Agreement are referred to as the "NPM Adjustment Settlements," and the states that are parties to the NPM Adjustment Settlements are the "Settling States"). It is undisputed that the PMs and the Settling States have resolved their claims regarding NPM Adjustments for sales years 2003–2017.

25. As a result of the several NPM Adjustment Settlements, the PMs have received substantial credits in the form of decreased MSA payments. ██████████ ████████████████████████████████████████████ (ECF No. 121.1, at Exs. C, F [SEALED]; ECF No. 122.1, at Exs. C, F), ███████████ ████████████████████████████. (PwC Dep. 95:16–20, ECF No. 121.1, at Ex. G [SEALED] ( "███████████ ██████ ████ ████ ████ ████ ██████ ████████ ██████████████████████████████████████████████████████ ████ "); Letter from Josh Shapiro, Atty Gen. of Pa., June 20, 2018, ECF No. 130.)[4]

---

[4] Additional detail regarding the specific resolutions of the NPM disputes can be found in Defendants' Brief in Support of Defendants' Motion for Summary Judgment. (ECF No. 120, at pp. 4–7 [SEALED]; ECF No. 129.1, at pp. 4–7.)

26.     Eleven MSA States have not joined in the NPM Adjustment Settlements and continue to dispute the NPM adjustments with PMs. (ECF No. 134, at p. 16 [SEALED]; ECF No. 136, at p. 16.)

**E.     Plaintiff's Request for Release of Escrow Funds**

27.     On October 19, 2016, Plaintiff sent a letter to the Attorney General requesting that he authorize a release of Plaintiff's alleged overpayments of funds in its Escrow Fund for the sales years 2005 through 2015. (October 19, 2016 Letter, ECF No. 44, at Ex. 1.) The letter provided, in relevant part, as follows:

> On behalf of S&M Brands, Inc. ("S&M Brands"), I am writing to request that your office authorize a release of S&M Brands' escrow funds, pursuant to the North Carolina General Statutes §66-291(b)(2), for sales years 2005 through 2015.

> Based on its own analysis, S&M Brands believes that its escrow payments on account of units sold in North Carolina have been greater than the Master Settlement Agreement ("MSA") payments, as determined pursuant to Section IX(i) of the MSA (including after all adjustments), that S&M Brands would have been required to make on account of such units sold had it been a participating manufacturer. S&M Brands is therefore entitled to a release of the excess funds from escrow pursuant to North Carolina General Statutes § 66-291(b)(2).

> The calculation of S&M Brands' release should take into account Section IX (i)(1) of the MSA, which provides that a subsequent participating manufacturer has payment obligations under the MSA only to the extent that its market share in any year exceeds its 1998 market share, or 125 percent of its 1997 market share. S&M Brands has been in business since 1993, and should therefore receive releases to the extent that its escrow deposits exceed the payments it would have made as a subsequent participating manufacturer after all adjustments,

including adjustments to account for S&M Brands' market share in 1997 or 1998.

(*Id.*)

28.     On May 25, 2017, the Attorney General replied by letter informing Plaintiff that it already had received the refund of its excess payment for the sales year 2005. ("May 25, 2017 Letter," ECF No. 44, at Ex. 2.) The letter also provided as follows:

> As to sales years 2006-2015, it is premature to consider any escrow amounts being in excess of the PMs' annual payments to the State for several reasons. First, you state that the Term Sheet settlement is a basis for your claim that S&M Brands' escrow deposit now exceeds the annual payments of the PMs for those claimed years. However the Term Sheet is simply that, terms upon which the parties are to base a final NPM adjustment settlement. A final NPM adjustment settlement is still in negotiation and is yet to be finalized and executed by the parties to the Term Sheet. The NPM adjustment settlement between the State and the PMs is not yet final.
>
> Secondly, North Carolina's escrow statute allows for such a release only upon final resolution of all adjustments, including the NPM adjustment. See N.C. Gen. Stat. §66-291(b)(2). As you probably are aware, the 2004 Diligent Enforcement arbitrations are now going on between the PMs and the Settling States which did not join the Term Sheet as well as New York which settled separately its NPM adjustment claims with the PMs. Only sales year 2003 has been 'nearly' resolved with finality. New Mexico's appeal of its 2003 Diligent Enforcement Arbitration Award is still not final. North Carolina is still at risk of claims against it from Settling States participating in the 2004 Diligent Enforcement arbitrations as well as similar future arbitrations for sales years 2005-2015 and beyond.
>
> In addition, as to sales years 2013-2015, the MSA provides for recalculation of amounts due from the PMs for up to four years after the payment due date. Therefore the

> determinations by the Independent Auditor of the PMs' annual payment amounts for those years are not yet locked and final.
>
> Based on the above, North Carolina must decline at this time S&M Brands' request for authorization to release escrow held for the benefit of this State.

(*Id.*)

29. Plaintiff alleges that "the State has ample information within its possession and control to determine that S&M Brands has made excess escrow payments that should be released" and the claim that it would be premature to release Plaintiff's excess escrow payments is "a ruse to justify the State's continued unlawful retention of [Plaintiff's] property." (ECF No. 36, at ¶¶ 119–20.) Plaintiff further alleges that there is no administrative process in place under which it can challenge the Attorney General's failure to release the funds. (*Id.* at ¶¶ 122–26.) It is undisputed that neither the May 25, 2017 Letter nor the administrative regulations applicable to the North Carolina Department of Justice set out an administrative process by which S&M Brands could challenge the Attorney General's determination. (ECF No. 71, at ¶ 122.)

### F. Plaintiff Claims the Escrow Fund Payments Impacted its Ability to Compete.

30. Plaintiff alleges that because of the burden placed on its business by making the payments into its Escrow Fund, it has not been able to compete with PMs. (ECF No. 140, at p. 6 [SEALED]; ECF No. 142, at p. 6.) Plaintiff contends that "[c]igarette manufacturers require capital to remain price-competitive, and S&M Brands – with its capital tied up in escrow – has not been able to remain competitive

with PMs." (*Id.*) Plaintiff alleges that while PMs have been able to increase the prices for cigarettes and maintain Market Share, Plaintiff has lost sales. (*Id.*) Plaintiff claims it would be able to compete if its escrow payment obligations were similar to the PMs' MSA settlement payments. (*Id.*)

31.     Plaintiff and Defendants both filed extensive expert witness reports containing detailed analysis of their respective positions on how Plaintiff's payments into its Escrow Fund have impacted its sales and revenues, and whether, and in what amounts, Plaintiff has overpaid into the Escrow Fund. (ECF Nos. 118.3 [SEALED], 118.4 [SEALED].) The parties vociferously dispute the factual assumptions, methodology, and conclusion of the other party's expert reports. (ECF No. 142, at pp. 15–19; ECF No. 140 [SEALED], at pp. 15–19; ECF No. 129.1, at pp. 28–31; ECF No. 120 [SEALED], at pp. 28–31.)

### G.     Procedural History

32.     On June 6, 2017, Plaintiff filed the Complaint in this action. (Complaint, ECF No. 1.) Plaintiff filed the Amended Complaint on September 29, 2017. (ECF No. 36.)

33.     In the Amended Complaint, Plaintiff alleges that it has made payments into its Escrow Fund in excess of what it would have paid as a PM under section IX(i) of the MSA and that it is entitled to a release of the overpayments. (ECF No. 36, at ¶¶ 84–92.) Plaintiff further alleges that North Carolina has taken steps to increase the burden and expense on the NPMs of complying with the NC Qualifying Statute for the purpose of reducing NPMs' sales. (ECF No. 36, at ¶¶ 70–83.) For example,

Plaintiff claims North Carolina amended the NC Qualifying Statute in 2005 to "dramatically decrease[ ]" releases of escrow payments available to NPMs and "to reduce the NPMs' market share for the PMs' benefit." (*Id*. at ¶ 79.)

34. Plaintiff also alleges that while Plaintiff's payments under the NC Qualifying Statute have increased, the OPMs and some SPMs have benefitted from reduced payment obligations to North Carolina. (*Id*. at ¶¶ 102–09.)

35. Finally, Plaintiff alleges that the effect of the MSA and the NC Qualifying Statute has been to create an "output cartel," or monopoly, for the PMs, permitting them to increase cigarette prices and their revenues while making it nearly impossible for Plaintiff and other NPMs to compete. (*Id*. at ¶¶ 127–37.)

36. Based on these allegations, the Amended Complaint makes claims for: (1) a declaratory judgment that the amount that is currently being held in Plaintiff's Escrow Fund is in excess of the amount required under the NC Qualifying Statute, and that Plaintiff is entitled to a release of the excess funds (Count I); (2) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, § 34 against monopolies (Count II); (3) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, § 32 against exclusive or separate emoluments or privileges (Count III); and (4) a declaratory judgment that the NC Qualifying Statute violates N.C. Const. art. I, §§ 1 and 19 by depriving Plaintiff of the fruits of its labor (Count IV). (ECF No. 36, at ¶¶ 138–77.)

37. On October 26, 2017, Defendants filed a motion to dismiss, seeking dismissal of all claims in the Amended Complaint. (ECF No. 43.) The matter was

briefed, and the Court held a hearing on the motion to dismiss. On April 2, 2018, the Court entered an Order and Opinion on Defendants' Motion to Dismiss the Amended Complaint denying the motion to dismiss. ("Order on Motion to Dismiss," ECF No. 68); *S&M Brands, Inc. v. Stein*, 2018 NCBC LEXIS 26 (N.C. Super. Ct. Apr. 2, 2018).

38. On April 23, 2018, Defendants filed their Answer to the Amended Complaint. (ECF No. 71.)

39. On July 31, 2019, Plaintiff filed Plaintiff's Motion seeking partial summary judgment on two issues only: (1) that "the calculation of S&M Brands' annual escrow overpayments must account for S&M Brands' 1998 market share rather than treating such market share as non-existent (zero)"; and (2) that "the phrase 'final determination of all adjustments' in N.C. Gen. Stat. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow." (ECF No. 122, at p. 1.) Both issues involve only Count I of the Amended Complaint. Plaintiff's Motion was fully briefed. (Pl. Br. Supp. Mot. for Partial Summ. J., ECF No. 125, ECF No. 123 [SEALED]; Defs.' Br. Opp. Pl. Mot. for Partial Summ. J., ECF No. 149.1, ECF No. 134 [SEALED]; Pl. Reply Supp. Mot. for Partial Summ. J., ECF No. 148.)

40. On the same day, Defendants filed Defendants' Motion seeking summary judgment in their favor on all claims in the Amended Complaint. (ECF No. 117.) Defendants' Motion has been fully briefed. (Defs.' Br. Supp. Mot. for Summ. J., ECF No. 129.1, ECF No. 120 [SEALED]; Pl. Br. Opp. Defs.' Mot. for Summ. J., ECF

No. 142, ECF No. 140 [SEALED]; Defs.' Reply Supp. Mot. for Summ. J., ECF No. 149.2, ECF No. 146 [SEALED].)

41. The Court held a hearing on the Summary Judgment Motions at which counsel for both parties appeared and made argument. The Summary Judgment Motions are ripe for determination.

## II. STANDARD OF REVIEW

42. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c) (hereinafter the North Carolina Rules of Civil Procedure are referred to as the "Rules")). An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by

showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted).

43. Once the movant presents evidence in support of its motion, the burden shifts to the nonmovant and the nonmovant "cannot rely on the allegations or denials set forth in [its] pleading . . . and must, instead, forecast sufficient evidence to show the existence of a genuine issue of material fact in order to preclude an award of summary judgment." *Steele v. Bowden*, 238 N.C. App. 566, 577, 768 S.E.2d 47, 57 (2014) (internal citations and quotations omitted). In conducting its analysis, the Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. The nonmovant "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

III. ANALYSIS

44. Each of Plaintiff's four claims seeks a declaratory judgment. Under North Carolina law, a declaratory judgment is a statutory remedy that grants the courts authority to "declare rights, status, and other legal relations" when an "actual controversy" exists between parties to a lawsuit. N.C.G.S. § 1-253; *Town of Pine Knoll Shores v. Carolina Water Serv.*, 128 N.C. App. 321, 321, 494 S.E.2d 618, 618 (1998). The Court may, by declaratory judgment, "determine[ ] any question of construction or validity" and declare "rights, status or other legal relations" under a

written contract. N.C.G.S. § 1-254. "As with all other actions, . . . there must be a justiciable controversy before the Declaratory Judgment Act may be invoked. There is a justiciable controversy if litigation over the matter upon which declaratory relief is sought appears unavoidable." *Ferrell v. Department of Transp.*, 334 N.C. 650, 656, 435 S.E.2d 309, 313 (1993). An action for declaratory judgment is ripe for adjudication when "there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." *Andrews v. Alamance Cty.*, 132 N.C. App. 811, 813–14, 513 S.E.2d 349, 350 (1999).

45.     The decision to grant or deny a claim for declaratory judgment lies within the discretion of the trial court. N.C.G.S. § 1-257; *Coca-Cola Bottling Co. Consol. v. Durham Coca-Cola Bottling Co.*, 141 N.C. App. 569, 578, 541 S.E.2d 157, 163 (2000).

### A.     Plaintiff's Constitutional Claims – Counts II–IV

46.     The Court will first address Defendants' Motion seeking dismissal of Plaintiff's constitutional challenges. Plaintiff's Second, Third, and Fourth counts, respectively, seek declaratory judgments that the NC Qualifying Statute violates the Constitution of North Carolina as applied to Plaintiff because it: (a) creates a monopoly in favor of the OPMs in violation of Article I, § 34; (b) provides an exclusive emolument to the OPMs in violation of Article I, § 32; (c) and deprives Plaintiff of the "fruits of its labor" in violation of Article I, §§ 1 and 19. (ECF No. 36 at ¶¶ 148–77.)

47.     Defendants move for summary judgment in their favor on Plaintiff's constitutional claims. (ECF No. 129.1, at pp. 15–20; ECF No. 120 [SEALED], at pp.

15–20.) Plaintiff does not seek summary judgment in its favor on its constitutional claims, but opposes Defendants' Motion. (ECF No. 142, at pp. 19–28; ECF No. 140 [SEALED], at pp. 19–28.)

48. Defendants make three arguments in support of their request for summary judgment on the constitutional claims. First, Defendants argue that the claims are moot because Plaintiff has sold its cigarette brands and ceased manufacturing or selling cigarettes and, therefore, the declaratory relief it seeks cannot have any "practical effect." (ECF No. 129.1, at pp. 15–17; ECF No. 120 [SEALED], at pp. 15–17.) Second, Defendants argue that Plaintiff has an adequate alternative remedy under state law and cannot pursue its constitutional claims against Defendants. (*Id.* at p. 16.) Finally, Defendants argue that the constitutional claims are "without merit." (*Id.* at pp. 17–20.) Since the Court finds Defendants' second argument dispositive, it addresses only that issue.

49. Plaintiff alleges "as-applied" challenges, rather than facial challenges, to the NC Qualifying Statute. *State v. Packingham*, 368 N.C. 380, 392, 777 S.E.2d 738, 748 (2015), *rev'd on other grounds*, *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ("A statute that is constitutional on its face nevertheless may be unconstitutional as applied to a particular defendant."). "An as-applied challenge contests whether the statute can be constitutionally applied to a particular defendant, even if the statute is otherwise generally enforceable. A facial challenge maintains that no constitutional applications of the statute exist, prohibiting its

enforcement in any context. The constitutional standards used to decide either challenge are the same." *Id.* at 383, 777 S.E.2d at 743.

50. However, "the courts of this State will avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds." *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002) (per curiam) (citing *State v. Crabtree*, 286 N.C. 541, 543, 212 S.E.2d 103, 105 (1975) and *Rice v. Rigsby*, 259 N.C. 506, 512, 131 S.E.2d 469, 473 (1963)). In addition, a constitutional claim cannot be brought against the State of North Carolina and its officers if there exists an adequate alternative remedy under state law. *Corum v. Univ. of N.C.*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). "[W]here an adequate state remedy exists, those direct constitutional claims must be dismissed." *Wilcox v. City of Asheville*, 222 N.C. App. 285, 298, 730 S.E.2d 226, 236 (2012). "In order for a remedy to be adequate, 'a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim' and 'the possibility of relief under the circumstances.'" *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 676, 748 S.E.2d 154, 159 (2013) (quoting *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 339–40, 678 S.E.2d 351, 355 (2009)).

51. Plaintiff concedes that "[t]he principal relief sought in Counts II–IV is a declaration that the Attorney General's withholding of escrow is unlawful. Such a declaration would result in a release of the disproportionate payments made by S&M Brands." (ECF No. 142, at p. 20; ECF No. 140 [SEALED], at p. 20, citing to Pl.'s Resp. to Defs.' Third Interrogs. No. 2.) Moreover, Plaintiff "has acknowledged (since the early stages of this litigation) that relief under Count I would likely resolve its

constitutional concerns." (*Id.* at p. 21.) Finally, Plaintiff admits that a declaration in its favor on the non-constitutional claim (Count I) could provide it with the relief it seeks: a release of alleged overpayments into its escrow account. (*Id.* at pp. 20–21.) However, Plaintiff also contends that the non-constitutional claim only provides an adequate remedy if it prevails on the claim and receives the release of overpayment. (*Id.* at pp. 21–22.)

52.     Plaintiff misapprehends the nature of an adequate alternative remedy. To constitute an adequate alternative remedy, the cause of action merely needs to provide a party with the "possibility of relief under the circumstances," not the certainty of obtaining the party's desired remedy. *Craig*, 363 N.C. at 340, 678 S.E.2d at 355; *see also Wilcox*, 222 N.C. App. at 300, 730 S.E.2d at 237 (noting that the holding in *Craig* stands for the proposition that "[a]dequacy does not depend on whether 'plaintiff will . . . *ultimately succeed on the merits of his case.*'" (emphasis in original) (quoting *Craig*, 363 N.C. at 340, 678 S.E.2d at 355)). "'[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim.'" *Copper v. Denlinger*, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010) (quoting *Craig*, 363 N.C. at 339–40, 678 S.E.2d at 355).

53.     In this case, Plaintiff's constitutional claims seek the same relief as its non-constitutional declaratory claim: an order requiring release of any overpayments into its Escrow Fund. *Wilcox*, 222 N.C. App. at 300, 730 S.E.2d at 237 (Where plaintiff's non-constitutional claims "are not absolutely, entirely, or automatically

precluded. . . . such a possibility warrants a finding of adequacy" and such claims "serve as an adequate remedy."). Plaintiff has an adequate remedy for its injuries under its Count I claim and its constitutional claims in Counts II–IV should be dismissed. Therefore, to the extent Defendants seek summary judgment as to Counts II–IV of the Amended Complaint, Defendants' Motion should be GRANTED.

**B.    Plaintiff's Claim for Interpretation of N.C.G.S. § 66-291(b)(2) – Count I**

54.    The specific nature of the declaration, or declarations, sought by Plaintiff regarding its right to receive a release of funds from its Escrow Fund is not clear. Plaintiff states the declarations it seeks differently in different filings it has made with the Court, and the requested declarations are not wholly aligned. In the first cause of action in the Amended Complaint (Count I), Plaintiff alleges that "S&M Brands is entitled to a declaratory judgment that the amount that is currently being held in escrow is in excess of the amount required by N.C. Gen. Stat. § 66-291," (ECF No. 36, at ¶ 147), but in the prayer for relief in the Amended Complaint Plaintiff asks for "a declaratory judgment that S&M Brands is entitled *to a release* of the excess funds being held in escrow[.]" (*Id.* at p. 28 (emphasis added)). On the other hand, in Plaintiff's Motion, it "requests that the Court declare that: (1) the calculation of S&M Brands' annual escrow overpayments must account for S&M Brands' 1998 market share rather than treating such market share as nonexistent (zero); and (2) the phrase "final determination of all adjustments" in N.C. Gen. Stat. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow." (ECF No. 122, at p. 1.)

55. The Court has thoroughly reviewed the Amended Complaint, Plaintiff's Motion, and Plaintiff's briefs filed with the Court on the Summary Judgment Motions and concludes, under a liberal reading of Plaintiff's allegations and arguments, Plaintiff seeks declarations that: (1) the phrase "including after final determination of all adjustments" in N.C.G.S. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow; (2) S&M Brands has established that the adjustments reached through the NPM Adjustment Settlements are sufficiently final to require the Attorney General to authorize a release of any overpayments S&M Brands made into its Escrow Fund for the sales years 2006–2017; (3) N.C.G.S. § 66-291(b)(2) requires that the calculation of S&M Brands' annual escrow overpayments be determined by considering S&M Brands' 1998 Market Share, or 125% of its 1997 Market Share, rather than treating such Market Share as nonexistent (zero); and (4) the amounts that S&M Brands paid into the Escrow Fund for sales years 2006–2017 were in excess of the amount required by N.C.G.S. § 66-291.

56. Preliminarily, the Court concludes that it cannot, at this stage of the case and based on the record before it, determine whether Plaintiff has made overpayments into its Escrow Fund for sales years 2006–2017 or whether Plaintiff is entitled to releases from its Escrow Fund. While both sides have presented extensive evidence from expert witnesses purporting to calculate whether, and to what extent, Plaintiff has made overpayments, that evidence is diametrically opposed. In addition, both parties dispute most of the opposing party's expert's findings, much of

the underlying data relied on, and their methodologies. (ECF No. 142, at pp. 15–19; ECF No. 140 [SEALED], at pp. 15–19; ECF No. 129.1, at pp. 28–31; ECF No. 120 [SEALED], at pp. 28–31.) Therefore, the Court concludes that there are genuine disputes of material fact as to whether the amounts paid into the Escrow Fund by Plaintiff for sales years 2006–2017 were in excess of the amounts required by N.C.G.S. § 66-291 and, to the extent Plaintiff's Motion and Defendants' Motion seek summary judgment on the claim for such a declaration, Plaintiff's Motion and Defendants' Motion should be DENIED.

57. The Court will next consider whether Plaintiff is entitled to the remaining declarations.

i. *The phrase "including after final determination of all adjustments" in N.C.G.S. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow.*

58. Each of Plaintiff's requested declarations are dependent on the Court's construction and interpretation of § 66-291(b)(2) of the NC Qualifying Statute. The Supreme Court of North Carolina recently reiterated

> Questions of statutory interpretation are ultimately questions of law for the courts . . . . The principal goal of statutory construction is to accomplish the legislative intent. The best indicia of that intent are the language of the statute . . . , the spirit of the act and what the act seeks to accomplish. The process of construing a statutory provision must begin with an examination of the relevant statutory language. It is well settled that [w]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning. In other words, [i]f the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning.

*Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547, 809 S.E.2d 853, 858 (2018) (quotations and citations omitted); *see also N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) ("When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.") (citing *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387, 628 S.E.2d 1, 3 (2006)).

59.     Plaintiff argues that the phrase "including after final determination of all adjustments" is clear and unambiguous and means that NPMs may seek to establish a right to a release of escrow overpayments at times other than, and prior to, the final determination of every potential NPM Adjustment to be made with regard to every MSA State.[5] Plaintiff contends that the word "including" "should be read as *enlarging*, not limiting, the events justifying the release of escrow funds and does not permit the Attorney General to delay releases where there may be additional adjustments in the future." (ECF No. 125, at p. 15 (emphasis added); ECF No. 123 [SEALED], at p. 15 (emphasis added); ECF No. 148, at pp. 8–10.) In support of its argument, Plaintiff cites to North Carolina appellate decisions that consistently have interpreted the word "including" to be a non-limiting term when used in North Carolina statutes. (*Id.*); *see N.C. Turnpike Auth. v. Pine Island, Inc.*, 265 N.C. 109,

_____

[5] Although the MSA provides for other adjustments to the amounts to be paid by a PM for a particular year (e.g., an Inflations Adjustment and a Non-Settling States Reduction), the parties agree that the only adjustment at issue in this case is the NPM Adjustment.

120, 143 S.E.2d 319, 327 (1965) ("The term 'includes' is ordinarily a word of enlargement and not of limitation. The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (citations omitted); *Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 357, 768 S.E.2d 23, 27 (2014) (same) (quoting *N.C. Turnpike Auth.*, 265 N.C. at 120, 143 S.E.2d at 327); *State ex rel. Utils. Comm'n v. EDF*, 214 N.C. App. 364, 367, 716 S.E.2d 370, 372 (2011) (same).

60.     In *N.C. Turnpike Auth.*, the Supreme Court considered whether language in the statute creating the North Carolina Turnpike Authority ("Authority") precluded the Authority from constructing a highway that had only one lane in each direction. The statute stated that the purpose of the Authority was "to provide for the construction of modern highways and express highways or superhighways embodying safety devices, including center division, ample shoulder widths, long-sight distances, multiple lanes in each direction and grade separation at intersections with other highways and railroads . . . ." 265 N.C. at 111, 143 S.E.2d at 321. Adopting the conclusion of the United States District Court for the Southern District of West Virginia in interpreting West Virginia's nearly identical statute, the Court held:

> "The plain language does not admit of this construction. Clearly, by use of the word 'including' the lawmakers intended merely to list examples of known safety devices, but not to exclude others equally well known. Had the latter been their intention, the proper expression to have been used would have been 'comprising,' 'consisting of,' or some synonymous term . . . ." This statutory construction is equally applicable to our act, which prefaces a listing of

turnpike safety devices with the word *including*. "The term 'includes' is ordinarily a word of enlargement and not of limitation. The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions."

265 N.C. at 120, 143 S.E.2d at 327 (citations omitted) (emphasis in original).

61. Similarly, in *State ex rel. Utils. Comm'n*, the North Carolina Court of Appeals analyzed the word "including" as used in a North Carolina statute and reached the same conclusion, holding:

> *The New Oxford American Dictionary* defines the word "including" to mean "containing as part of the whole being considered." Similarly, *Black's Law Dictionary* explains, "The participle including typically indicates a partial list." Both of these definitions suggest that a list introduced by the word "including" would be illustrative, rather than exhaustive. Moreover, our Supreme Court has indicated that use of the word "including" expresses legislative intent to list examples.

214 N.C. App. at 367, 716 S.E.2d at 372 (citations omitted).

62. Defendants argue that under the language of N.C.G.S. § 66-291(b)(2), Plaintiff "cannot establish the right to a release . . . until there has been a final determination of the NPM Adjustments for a 'particular year,' and that "[i]t is undisputed that there has been no final determination of the NPM Adjustments for the years 2006–2017, which are the years subject to Plaintiff's Count I." (ECF No. 129.1, at p. 26; ECF No. 120 [SEALED], at p. 26.) Defendants appear to contend that the Court should ignore the use of "including" in the statute, arguing "[i]n other contexts where statutes list some items that fall within a broader referenced category, it may make sense to read 'including' to mean 'including but not limited to' the

specified examples. That is not the situation here, and it makes no sense to read the statutory language as meaning 'including partial determinations of all adjustments.'" (*Id*.) However, Defendants do not cite to any authority from North Carolina or any other jurisdiction that interprets the word "including" as being a word of limitation rather than expansion.

63. Defendants also argue that Plaintiff's "interpretation would lead to regulatory chaos, allowing an NPM to claim a release based on a hypothetical MSA payment obligation as soon as PwC determined the maximum potential NPM Adjustment for the year at issue. Thereafter, each time there was a change in that amount due to a partial resolution by arbitration, litigation, or settlement, an NPM that had previously obtained a release would have to re-deposit the additional MSA payment that it would have owed as a hypothetical PM." (*Id*. at pp. 26–27.) However, Defendants' argument misapprehends the nature of the relief Plaintiff seeks. In this lawsuit, Plaintiff does not contend that it, or any other NPM, is entitled to a release of overpayments as soon as PwC releases its payment obligations for the PMs and determines that maximum NPM Adjustment for a given year. Rather, it contends that its overpayments can be calculated for the years 2006–2017 because the various NPM Adjustment Settlements have rendered the NPM Adjustments that impact North Carolina NPMs sufficiently final to permit a release for those years. ███

Finally, Defendants have not pointed to any evidence in the record supporting its speculation that permitting releases from NPMs' escrow accounts for 2006–2017 would cause "regulatory chaos."

64.     The Court cannot simply choose to read the word "including" out of the statute. *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016) ("Courts should give effect to the words actually used in a statute and should neither delete words used nor insert words not used in the relevant statutory language during the statutory construction process.") (citations and quotations omitted). Rather, the court should "give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr.*, 363 N.C. at 201, 675 S.E.2d at 649. Conversely, the Court cannot treat the phrase "including after final determination of all adjustments" as meaningless. Rather, the Court should attempt to give meaning to each word and phrase of the statute to harmonize the competing implications of the language if possible. *State v. Williams*, 286 N.C. 422, 431, 212 S.E.2d 113, 119 (1975) ("It is a well established principle of statutory construction that a statute must be construed, if possible, so as to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage.")

65.     After carefully considering the language at issue and Plaintiff and Defendants' arguments, the Court concludes that the phrase "including after final

determination of all adjustments" is not clear and unambiguous[6] and lacks a "plain meaning." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001). Therefore, the Court must "determine the purpose of the statute and the intent of the legislature in its enactment." *N.C. Dep't of Corr.*, 363 N.C. at 201, 675 S.E.2d at 649 (citation omitted); *Institutional Food House, Inc. v. Coble*, 289 N.C. 123, 135, 221 S.E.2d 297, 304 (1976) ("[I]f the language is ambiguous and the meaning in doubt, judicial construction is required to ascertain the legislative intent.").

66. A useful starting place for the analysis of the current section 66-291(b)(2) is to present it with the changes made by the General Assembly in the 2005 Amendment. The statute, as amended, appears as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the State in a particular year was greater than ~~the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement (as determined pursuant to section IX(i)(2) of the Master Settlement Agreement, and before any of the adjustments or offsets described in section IX(i)(3) of that Agreement other than the Inflation Adjustment)~~ the Master Settlement Agreement payments, as determined pursuant to Section IX(i) of that agreement, including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer[.]

---

[6] To the contrary, the Court believes the more reasonable interpretation is that had the General Assembly unambiguously intended to limit NPMs to seeking escrow releases only after every single MSA State had fully and finally resolved any NPM Adjustment disputes, it would have provided for such releases "after final determinations of all adjustments," and would not have prefaced that phrase with the word "including."

Act of Aug. 13, 2005, ch. 276, § 6.12(a), 2005 N.C. Sess. Laws 668, 702 (codified as amended at N.C.G.S. § 66-291(b)(2)) (language added to statute is underlined; language removed from statute is stricken).

67. The 2005 Amendment appears to have made at least two significant changes to section 66-291(b)(2):

a. Prior to the 2005 Amendment, an NPM's overpayment was calculated by comparing the amount the NPM actually paid into its Escrow Fund based on the number of cigarettes it sold in North Carolina in a sales year to the amount it would have been required to pay if it paid an amount equal to North Carolina's Allocable Share, or 2.3322850%, of the NPM's total United States sales, in dollars, for that year. The amended statute calculates an NPM's overpayment by comparing the NPM's actual payment into its Escrow Fund based on the number of cigarettes it sold in North Carolina in a sales year with the payment the NPM would have been required to make for that year if it were a SPM, paying on a hypothetical per cigarette basis instead of a national Market Share basis, as calculated under section IX(i) of the MSA.

b. Prior to the 2005 Amendment, the calculation of an NPM's overpayment accounted only for the Inflation Adjustment, and not the NPM Adjustment or any other adjustments to required payments provided by the MSA. The amended statute provides for consideration of all adjustments, including the NPM Adjustment, in determining the amount of an overpayment.

68. Both Plaintiff and Defendants contend that the purposes of the NC Qualifying Statute, and particularly the General Assembly's intent in making the 2005 Amendment, support their respective interpretations of N.C.G.S. § 66-291(b). Unfortunately, because of a dearth of factual evidence illuminating that intent, both sides argue the issue based on their competing views of the nature and purposes behind the 2005 Amendment.

69. Plaintiff first argues that the purpose of the NC Qualifying Statute, including § 66-291(b)(2), must be viewed against North Carolina's "long tradition of relying on and supporting tobacco farming and manufacturing," and that "this Court should [not] assume that the General Assembly intended to penalize small family-owned tobacco manufacturers who chose not to join the MSA." (ECF No. 125, at pp. 12–13; ECF No. 123 [SEALED], at pp. 12–13.) Plaintiff contends that the 2005 Amendment "expanded the offsets and adjustments available to NPMs by replacing the phrase 'and before any of the adjustments or offsets described in section IX(i)(3) of that Agreement other than the Inflation Adjustment' with 'including after final determination of all adjustments.'" (ECF No. 148, at p. 10.) Plaintiff further asserts that "[i]n so doing, the General Assembly provided that the full gamut of available adjustments must be considered in determining an NPM's escrow release." (*Id.*)

70. Plaintiff also contends that by adding the phrase "including after final determination of all adjustments," the General Assembly intended that an NPM be entitled to seek overpayments "when there has been a final determination of [the NPM] [A]djustments," but also prior to "all" final adjustments. (ECF No. 125, at p.

15; ECF No. 123 [SEALED], at p. 15.) "[W]hen an adjustment has been determined with sufficient degree *(sic)* that the PMs are afforded the benefit of the adjustment, that adjustment must be extended to the NPMs as well." (*Id.*) Plaintiff argues that N.C.G.S. § 66-291(b)(2) makes clear that an NPM's escrow payments shall be no more than a PM's MSA payments and that "[t]he General Assembly did not intend for the phrase 'after final determination of all adjustments' to be used . . . to provide an advantage to PMs in the marketplace" by allowing them to benefit from final settlements of NPM adjustments but prohibiting NPMs from obtaining similar benefits. (ECF No. 142, at p. 14; ECF No. 140 [SEALED], at p. 14.)

71.     Defendants place great importance on the statute's use of the word "required." Defendants contend that the General Assembly's decision in enacting the 2005 Amendment to tie an NPM's ability to receive a release to its ability to establish the amount it was *required* to place into escrow must mean that the required payment is finally determined after every potential adjustment to the comparison SPM payment has been determined. Defendants argue that had the General Assembly intended to permit a release of escrow funds before all final adjustments that could be applied to SPM payments, it "could have provided for a release based on a comparison between escrow deposits and the hypothetical *initially-required* MSA payment amounts, just as the pre-amended statute did." (ECF No. 147, at pp. 9–10 (emphasis in original); ECF No. 146 [SEALED], at pp. 9–10 (emphasis in original).) In other words, Defendants argue that by placing the words "including after final determination of all adjustments" into the statute, the General Assembly intended to

prohibit an NPM from obtaining a release until all NPM Adjustments had been finally determined with regard to all MSA States, thereby establishing the final "required" hypothetical payment a SPM would have been required to make if it made its payment based on the number of cigarettes it sold in North Carolina. Defendants provide a hypothetical illustration demonstrating how a SPM's final, required payments for 2006 could still increase depending on the resolution of the outstanding NPM Adjustment disputes. (ECF No. 136, at pp. 17–20; ECF No. 134 [SEALED], at pp. 17–20.)

72.    Plaintiff responds that North Carolina has settled its NPM Adjustment disputes with the PMs for the sales years 2006–2017, and the NPM Adjustments are final with regard to North Carolina for those years. It is undisputed that the NPM Adjustment Settlements released the PMs from further claims by the Settling States and finalized the payments that will be made to the Settling States, as their respective shares of the national payments, from the PMs for the settled years. In other words, North Carolina has received all payments it is going to receive from the PMs for the settled years. It is also undisputed that certain PMs have already received, and will receive in the future, credits against payments owed under the MSA as a result of the NPM Adjustment Settlements.

73.    The Court has thoroughly reviewed the evidence of legislative intent, sparse as it is, and the arguments of the parties regarding the purpose and intent of the 2005 Amendment. First, the Court finds that the word "including" cannot be read out of the 2005 Amendment, and the language of N.C.G.S. § 66-291(b)(2) does not

support Defendants' contention that an NPM can only seek, and the Attorney General can only authorize, a release from an Escrow Fund after every adjustment between all PMs and all MSA States has been finally adjudicated. Had that been the intent of the General Assembly in enacting the 2005 Amendment, the Court believes the legislature would not have used the word "including" but would simply have adopted the language "after final determination of all adjustments." This would have made clear that a release from an Escrow Fund could only be obtained after all final determinations of all adjustments.

74. In fact, there is nothing in section 66-291(b)(2) that expressly or impliedly leads to the conclusion that a release from an Escrow Fund for a particular sales year must only be decided one time and cannot be the subject of multiple revisions, including after determinations by North Carolina that NPM Adjustments for a particular year are sufficiently "final" to permit settlement of those adjustments with the PMs. The statute does not prohibit the Attorney General from authorizing releases subject to later revision and recoupment from an NPM if additional NPM Adjustments by Non-Settling States increase the NPM's payment for a particular year. While, in theory, this could lead to a regime in which the Attorney General must revisit certain release determinations, that regime is a result of the language used by the General Assembly, and the Court cannot ignore that language to further the convenience of the Attorney General.

75. On the other hand, the Court is mindful that the 2005 Amendment was made with the background of NPMs like Plaintiff being able to obtain releases of their

Escrow Funds based on a preliminary determination that its payment exceeded the Allocable Share it would have paid to North Carolina without comparison to the PM's payments or consideration of the impact that NPM Adjustments could have on the PM's payments. This background supports Defendants' contention that the 2005 Amendment intended to make a PM's required payments and NPM Adjustments a substantial factor in deciding whether the NPM has established an overpayment.

76. Perhaps most importantly, N.C.G.S. § 66-291(b)(2) places the burden of establishing the entitlement to a release on the NPM seeking the release. The NPM must establish that it has paid more into its Escrow Fund than it "would have been required to make . . . had it been a participating manufacturer." N.C.G.S. § 66-291(b)(2). This means the NPM must establish that there is sufficient information to show that North Carolina has made a final determination as to the amounts the PMs were required to pay for the sales year. AN NPM may be able to establish that final determinations for North Carolina as to what the PMs are required to pay for a given year by showing that a final determination was arrived at through North Carolina's settlement of NPM Adjustment claims with PMs, by showing a final decision has been made resolving arbitration and litigation between North Carolina and the PMs, or potentially by other means. However, that burden remains on the NPM.

77. Therefore, the Court concludes that, to the extent Plaintiff and Defendants seek summary judgment as to Plaintiff's claim for a declaration that (1) the words "including after final determination of all adjustments" in N.C.G.S. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made

overpayments into escrow, and (2) S&M Brands has established that the adjustments reached through the NPM Adjustment Settlements are sufficiently final to require the Attorney General to authorize a release of any overpayments S&M Brands made into its Escrow Fund for the sales years 2006–2017, Plaintiff's Motion should be GRANTED, and Defendants' Motion should be DENIED.

> *ii.* *Whether N.C.G.S. § 66-291(b)(2) requires that the calculation of S&M Brands' annual escrow overpayments be determined by considering S&M Brands' 1998 Market Share, or 125% of its 1997 Market Share, rather than treating such Market Share as nonexistent (zero).*

78. Under Count I, Plaintiff also seeks a declaration that N.C.G.S. § 66-291(b)(2) requires that the calculation of Plaintiff's annual escrow overpayments be determined by considering Plaintiff's 1998 Market Share, or 125% of its 1997 Market Share, rather than treating such Market Share as nonexistent (zero). The Court now addresses this claim. Both Plaintiff and Defendants seek summary judgment regarding this requested declaration.

79. Plaintiff's position is straightforward. Plaintiff contends that the 2005 Amendment must be interpreted as adopting the language of section IX(i) of the MSA into the statute. (ECF No. 125, at pp. 10–11; ECF No. 142, at pp. 9–12.) Section IX(i) of the MSA provides in relevant part as follows:

> (1) A Subsequent Participating Manufacturer shall have payment obligations under this Agreement only in the event that its Market Share in any calendar year exceeds the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share (subject to the provisions of subsection (i)(4)). . . .
>
> (2) The base amount due from a Subsequent Participating Manufacturer on any given date shall be

determined by multiplying (A) the corresponding base amount due on the same date from all of the Original Participating Manufacturers (as such base amount is specified in the corresponding subsection of this Agreement and is adjusted by the Volume Adjustment (except for the provisions of subsection (B)(ii) of Exhibit E), but before such base amount is modified by any other adjustments, reductions or offsets) by (B) the quotient produced by dividing (i) the result of (x) such Subsequent Participating Manufacturer's applicable Market Share (the applicable Market Share being that for the calendar year immediately preceding the year in which the payment in question is due) minus (y) the greater of (1) its 1998 Market Share or (2) 125 percent of its 1997 Market Share, by (ii) the aggregate Market Shares of the Original Participating Manufacturers (the applicable Market Shares being those for the calendar year immediately preceding the year in which the payment in question is due). . . .

(4) For purposes of this subsection (i), the 1997 (or 1998, as applicable) Market Share (and 125 percent thereof) of those Subsequent Participating Manufacturers that either (A) became a signatory to this Agreement more than [90] days after the MSA Execution Date or (B) had no Market Share in 1997 (or 1998, as applicable), shall equal zero.

(MSA §§ IX(i)(1), (2), (4).) Plaintiff argues that it is entitled to have its 1998 Market Share, or 125% of its 1997 Market Share, considered in calculating whether it made overpayments into its Escrow Fund under the "plain language" of the MSA because: (a) it never signed the MSA and, therefore, did not become a signatory to the MSA more than 90 days after the MSA Execution Date; and (b) Plaintiff had Market Share in 1997 and 1998. (ECF No. 125, at p. 11.)

80.     Defendants argue that the General Assembly's intent in enacting the 2005 Amendment was not to give NPMs the same benefit provided by the MSA to a grandfathered SPM of exempting its 1998 Market Share (or 125% of its 1997 Market

Share), but rather that the 2005 Amendment must be interpreted to mean that determination of an NPM's payments under the MSA would be the same as those of a non-grandfathered SPM. (ECF No. 136, at pp. 1–10; ECF No. 129.1, at pp. 21–25.) Defendants argue that N.C.G.S. § 66-291(b)(2) contains no express language entitling an NPM to have its "Market Share" considered in calculating its entitlement to a release of escrow payments. (ECF No. 136, at p. 12.) Defendants contend that

> Market share (i.e., a manufacturer's share of the total *nationwide* cigarette sales across all manufacturers in a given year as defined in MSA §II(z)) simply plays no role in determining whether a tobacco manufacturer is entitled to an early release of escrow under N.C.G.S. §66-291(b)(2). Instead, the statute sets up a comparison between: (a) the NPM's escrow deposits actually made on its *North Carolina "units sold"* in a particular year; and (b) the MSA payments that the NPM would have been required to make as a hypothetical SPM on its *North Carolina "units sold"* in that same year.

(*Id.* at p. 2 (emphasis in original).)

81.     Defendants further contend that attempting to use a Market Share-based exemption as part of the calculation required by section 66-291(b)(2) makes no sense because "there is no such thing as a North Carolina grandfather share." (ECF No. 129.1, at p. 24 n.93.) Rather, "Market Share" as defined by the MSA refers only to a PM's percentage of nationwide cigarette sales. Defendants assert that

> N.C.G.S. §66-291(b)(2) provides for a comparison of two payment requirements: (1) the escrow deposit an NPM is required to make on all of its units sold in North Carolina in a particular year, and (2) the hypothetical MSA payment that it would have been required to make under MSA §IX(i) on those same units sold had it been a PM.

By contrast, the [Plaintiff's] grandfathered-share based comparison . . . rewrites the statute and is a necessarily skewed one: (1) the escrow deposit the NPM is required to make on 100% of its units sold in North Carolina "in a particular year" versus (2) the hypothetical MSA payment that it would have been required to make on those units sold minus [a theoretical North Carolina Market Share.]

(*Id.* at p. 24.) Defendants argue that the General Assembly could not have intended to remove language permitting a release based on a comparison of the cigarettes sold by an NPM to what it would have paid based on North Carolina's allocable share of its nationwide sales only to replace it with a calculation taking into account the NPM's 1998 nationwide Market Share. (ECF No. 136, at p. 8 ("[T]he amended statute does not provide for a *nationwide* market share-based calculation and expressly states that both actual escrow deposits and hypothetical MSA payments are based on the manufacturer's *North Carolina* "units sold ") (emphasis in original).)

82.    Defendants also argue that permitting NPMs to take advantage of the grandfathered Market Share exemption would defeat the very incentive created by the 90-day signing requirement in the MSA, which was designed to encourage small tobacco manufacturers to agree to be bound by the MSA. (ECF No. 129.1, at pp. 24–25; ECF No. 136, at pp. 5–6); *see, e.g., KT&G Corp. v. AG of Okla.*, 535 F.3d 1114, 1120 (10th Cir. 2008) ("As an incentive to join the MSA, the agreement provides that, if an SPM joined within ninety days following the MSA's 'Execution Date,' that SPM is exempt ('exempt SPM') from making annual payments to the settling states *unless* the SPM increases its share of the national cigarette market beyond its 1998 market share, or beyond 125% of that SPM's 1997 market share.") (emphasis in

original); *Grand River Enters. Six Nations v. Beebe*, 574 F.3d 929, 933 (8th Cir. 2009) (same). Defendants note that the NC Qualifying Statute was originally enacted by the General Assembly long after the 90-day period for tobacco manufacturers to join the MSA as a grandfathered SPM had passed. (ECF No. 136, at p. 6.) Accordingly,

> Under the statute, a tobacco manufacturer, such as S&M, that was invited to join the MSA as a grandfathered SPM[ ] and declined that invitation, had two options available to it if it wanted to continue selling cigarettes in North Carolina "after the enactment of this Act." It could either: (a) become a non-grandfathered SPM and voluntarily subject itself to the conduct and payment obligations of the MSA Agreement; or (b) remain an NPM and make escrow deposits required by the statute. . . .
>
> It would have made no sense for the legislature to allow manufacturers like S&M that chose option (b) and remained NPMs to be allowed to retroactively claim a more favorable grandfathered status under the statute than the manufacturers that chose option (a) and became non-grandfathered SPMs.

(*Id.*)

83. Finally, Defendants argue that courts interpreting the identical 2005 Amendment language contained in other states' Qualifying Statutes, although not called upon to rule on the issue, have recognized that the comparison for purposes of deciding a release to an NPM should be between an NPM's actual payment and a non-grandfathered SPM's payment. (ECF No. 136, at p. 9, citing *S&M Brands, Inc. v. Caldwell*, 614 F.3d 172, 175 (5th Cir. 2010) (discussing Louisiana's Qualifying Statute and stating that "if an NPM pays more to the qualified escrow account than it would have to pay if it were a non-grandfathered SPM, the NPM is entitled to a refund of the excess amount it paid."); *Grand River Enters. Six Nations v. King,* 783

F. Supp. 2d 516, 541 (S.D.N.Y. 2011). In *Grand River Enters.*, the court further opined that:

> Under New York's Escrow Statute, for example, an NPM is entitled to a refund of any escrow payments "on account of units sold" in New York exceeding "the master settlement agreement payments . . . that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer." N.Y. Pub. Health Law § 1399-pp(2)(b)(ii). In other words, an NPM's escrow payments are capped by its theoretical MSA payments if it joined the MSA as a *non-grandfathered SPM*. It is true that the calculation of the theoretical MSA payment does take into account a manufacturer's nationwide sales. However, the undisputed evidence in the record shows that non-grandfathered SPM payments under the MSA (the amount an NPM would pay if it joined the MSA today) are greater than NPM escrow payments. Since there is no evidence that an NPM's escrow payments have exceeded or will exceed the cap, there is no refund under the amended allocable share release provision. This means that an NPM's actual net escrow payment is simply the number of cigarettes sold in-state times $.0188482, *an amount that is in no way tied to a national-market-share-dependent MSA payment.* In reality, an NPM's escrow payments are determined solely on the basis of in-state sales . . . .

*Id.* at 541–42 (emphasis added).

84. Plaintiff, on the other hand, contends, without citing supporting evidence arising from the enactment of the 2005 Amendment, that the plain language of the 2005 Amendment makes clear the General Assembly's intent to support small tobacco manufacturers. (ECF No. 125, at pp. 12–13.) Plaintiff asserts that "North Carolina has a long tradition of relying on and supporting tobacco farming and manufacturing," and that "this Court should [not] assume that the General Assembly intended to penalize small family-owned tobacco manufacturers who chose not to join

the MSA." (*Id*. at pp. 12–13.) Plaintiff further argues that Defendants' interpretation of § 66-291(b)(2) "cannot be squared with our State's and the General Assembly's recognition that much of our economy was built on small family businesses, such as [Plaintiff] and other NPMs, engaged in growing and manufacturing tobacco." (*Id*. at p. 13.)

85.    Plaintiff also argues that in enacting the 2005 Amendment the General Assembly intended to "maintain[ ] a level playing field" and ensure that NPMs remained competitive with PMs. (ECF No. 142, at p. 12.) Plaintiff contends that "[b]y incorporating MSA § IX(i), the General Assembly plainly intended to cap an NPM's annual escrow payment at the annual payment obligation of a similarly-situated PM." (*Id*. at p. 11.) However, Plaintiff does not explain why the General Assembly would have wanted to give NPMs the benefit of the 1998 Market Share exemption provided to grandfathered SPMs who subjected themselves to the obligations of the MSA by signing on within the first 90 days after execution, as opposed to treating the NPM like a non-grandfathered SPM.

86.    Having summarized the arguments presented by the parties, the Court must first determine whether the language in the statute unambiguously establishes the intent of the legislature. *Wilkie*, 370 N.C. at 547, 809 S.E.2d at 858 ("The process of construing a statutory provision must begin with an examination of the relevant statutory language. It is well settled that [w]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning.") (citations and quotation marks

omitted). "If the language of a statute is free from ambiguity and expresses a single, definite, and sensible meaning, judicial interpretation is unnecessary and the plain meaning of the statute controls. Conversely, where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *Mazda Motors of America, Inc. v. Southwestern Motors, Inc.*, 296 N.C. 357, 361, 250 S.E.2d 250, 253 (1979) (citations and quotation marks omitted).

87.     The critical language at issue here is the portion of N.C.G.S. § 66-291(b)(2) providing that for purposes of establishing a right to release from its Escrow Fund, an NPM must show that its escrow payment exceeded "*the Master Settlement Agreement payments, as determined pursuant to Section IX(i) of that agreement, including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer.*" N.C.G.S. § 66-291(b)(2) (emphasis added). The language requires that an NPM's escrow payment be compared to the hypothetical payment of a "participating manufacturer" under the MSA on account of "units sold" in North Carolina. The MSA does not provide for calculation of a PM's payment obligation by using its units sold[7], let alone its units sold in a particular state, but rather by using the SPM's nationwide Market Share. Section 66-291(b)(2) provides no methodology for converting a PM's payment obligation based on its Market Share to a units sold

---

[7] The MSA does not define or use the terms "unit" or "units sold."

figure. This creates an ambiguity as to the proper means of calculating an NPM's hypothetical MSA payment.

88.     In addition, the use of the term "participating manufacturer," rather than "subsequent participating manufacturer," is itself somewhat confusing. Section 66-291(a)(1) of the NC Qualifying Statute defines "participating manufacturer" to mean a participating manufacturer "as defined in section II(jj) of the [MSA]." Section II(jj) of the MSA defines "Participating Manufacturer" to include both the OPMs and SPMs. Nevertheless, the General Assembly's specific reference to section IX(i) of the MSA in N.C.G.S. § 66-291(b)(2), which applies only to SPM's payments, to determine the hypothetical PM payment appears to clarify that the legislature intended for the comparison to be to SPMs.

89.     More significantly, to the extent that the General Assembly intended for an NPM's payment to be compared to a SPM's payment, the statute does not expressly specify whether the comparison should be made to a grandfathered or a non-grandfathered SPM for purposes of applying the Market Share exemption. This creates ambiguity as to the proper comparison.

90.     The Court concludes that the language at issue is ambiguous, and it does not have a plain meaning establishing the General Assembly's intent in adopting the language. Therefore, the Court must engage in construction of the statute. *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) ("When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of

legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.") (citation omitted).

91. As an initial matter, the Court concludes that by mandating that the hypothetical SPM payment be "determined pursuant to Section IX(i)," the intent was to incorporate each of the subparts of § IX(i), including section IX(i)(4). In fact, the prior version of N.C.G.S. § 66-291(b)(2) expressly provided that the a hypothetical payment an NPM would have been required to make was to be "determined pursuant to Section IX(i)(2)" of the MSA only. By adopting the broader language requiring calculation of the hypothetical payment pursuant to section IX(i), and not just section IX(i)(2), the General Assembly intended for § IX(i)(4) to be applied to the determination of an NPM's hypothetical SPM payment. Plaintiff's requested declaration turns on interpretation of how section IX(i)(4) applies to an NPM's request for release.

92. The purpose of section IX(i)(4) appears clear. The original parties to the MSA sought to encourage other tobacco product manufacturers to voluntarily submit themselves to the payment obligations and substantial restrictions on activities contained in the MSA. *KT&G Corp.*, 535 F.3d at 1120; *Grand River Enters. Six Nations v. Beebe*, 574 F.3d at 933. Permitting SPMs that quickly made the decision to sign on to the MSA to make payments calculated only on any increase over their 1998, or 125% of their 1997, national Market Share provided just such an incentive. However, the language of section IX(i)(4) demonstrates that the parties

also anticipated that tobacco manufacturers might choose to join the MSA after the 90-day period, and that those manufacturers should not reap the benefits of the Market Share exemption.

93. Furthermore, the NC Qualifying Statute arose out of the MSA, was adopted from the model qualifying statute included in the MSA, and expressly relies on many of the definitions and other provisions of the MSA. *See, e.g.*, N.C.G.S. §§ 66-290(1), (3), (5), (7), (8), (9); § 66-291(a), (b); § 66-292(4). It must be presumed that the General Assembly was aware of all the terms of the MSA when it enacted the NC Qualifying Statute and when it enacted the 2005 Amendment. *Cf. Dare County Bd. of Educ. v. Sakaria*, 127 N.C. App. 585, 588, 492 S.E.2d 369, 371 (1997) ("Further, it is presumed the legislature acted with full knowledge of prior and existing law, and with care and deliberation. Every statute is to be interpreted 'in light of the . . . laws as they were understood' at the time of the enactment at issue.") (citations omitted). In fact, Plaintiff concedes this point. (ECF No. 148, at p. 1 ("The statute relies on MSA § IX(i) for its meaning. Thus, the General Assembly's intent was to incorporate the MSA into this provision – as the General Assembly has done elsewhere.").) In addition, since the NC Qualifying Statute incorporates the MSA into the statute, the Court must interpret section IX(i)(4) in the context of the other provisions of the MSA and construe the MSA to give effect to all of its provisions. *State v. Williams*, 286 N.C. at 431, 212 S.E.2d at 119 ("It is a well established principle of statutory construction that a statute must be construed, if possible, so as to give effect to every

part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage.").

94.     The terms of the MSA make clear the distinction between the tobacco manufacturers that signed the MSA within the 90-day period and received the benefit of the Market Share exemption, and those that did not. The MSA also expressly recognizes NPMs as tobacco manufacturers who are not signatories to the MSA, and accordingly are entitled to none of its benefits. (MSA, § II(cc).) Construing the 2005 Amendment in this manner places an NPM in the same position as a grandfathered SPM for purposes of determining whether the NPM made an overpayment to its Escrow Fund and would be inconsistent with giving meaning to the other provisions of the MSA.

95.     The Supreme Court of North Carolina has held "[i]t is further and fully established that where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *State v. Burell*, 256 N.C. 288, 296, 123 S.E.2d 795, 801 (1962) (citation and quotation marks omitted). "[C]ourts tend to adopt an interpretation that avoids absurd results on the presumption that the General Assembly acted in accordance with reason." *State v. Shannon*, 182 N.C. App. 350, 360, 642 S.E.2d 516, 524 (2007) (citation omitted); *Printing Servs. of Greensboro, Inc. v. Am. Capital Group, Inc.,* 180 N.C. App. 70, 75, 637 S.E.2d 230, 233 (2006) ("[T]he judiciary must give 'clear and ambiguous language' its 'plain and definite meaning.' However, strict

literalism will not be applied to the point of producing 'absurd results.'") (quoting *Proposed Assessments of Additional Sales & Use Tax v. Jefferson-Pilot Life Ins. Co.*, 161 N.C. App. 558, 560, 589 S.E.2d 179, 181 (2003)).

96.     Plaintiff contends that under the plain language of section IX(i)(4) it is entitled to a grandfathered Market Share exemption in calculating its hypothetical SPM payment because it "*did not* 'bec[ome] a signatory to [the MSA] more than [90] days after the MSA Execution Date'" since it never signed the MSA, and it had Market Share in 1997 and 1998. (ECF No. 125, at p. 11 (emphasis in original).) Interpreting section 66-291(b) as proposed by Plaintiff would give Plaintiff, as well as every other NPM that existed at the time the MSA was executed, a benefit that they consciously chose not to accept—a grandfathered Market Share exemption. Such an interpretation would, *inter alia*: ignore the express definitions of "Non-Participating Manufacturer" and "Subsequent Participating Manufacturer" used in the MSA and incorporated into the Qualifying Statute; run directly counter to the purpose of the Market Share exemption to encourage tobacco manufacturers to voluntarily subject themselves to the obligations of the MSA; and place NPMs at an advantage over SPMs who signed the MSA more than 90 days after its execution. The Court concludes that this absurd result could not have been intended by the General Assembly, and that N.C.G.S. § 66-291(b)(2) provides that an NPM's right to an escrow release is determined by comparing the amount it was required to place into escrow on account of units sold in North Carolina to the amount that the NPM would have

been required to make on account of the units sold in North Carolina had it been a non-grandfathered SPM.

97. Therefore, the Court concludes that to the extent Plaintiff and Defendants seek summary judgment as to Plaintiff's claim for a declaration that N.C.G.S. § 66-291(b)(2) requires that any calculation of Plaintiff's annual escrow overpayments be determined by considering Plaintiff's 1998 Market Share, or 125% of its 1997 Market Share, rather than treating such Market Share as nonexistent (zero), Defendants' Motion should be GRANTED, and Plaintiff's Motion should be DENIED.

IV.   CONCLUSION

THEREFORE, IT IS ORDERED that Plaintiff's Motion is GRANTED, in part, and DENIED, in part, and Defendants' Motion is GRANTED, in part, and DENIED, in part, as follows:

1. To the extent it seeks summary judgment as to Plaintiff's claims in Counts II, III, and IV in the Amended Complaint, Defendants' Motion is GRANTED, and Counts II, III, and IV are DISMISSED.

2. To the extent the Summary Judgment Motions seek summary judgment on Plaintiff's request for a declaration that the amounts that S&M Brands paid into its Escrow Fund for sales years 2006–2017 were in excess of the amount required by N.C.G.S. § 66-291 (Count I), Plaintiff's Motion is DENIED, and Defendants' Motion is DENIED.

3. To the extent the Summary Judgment Motions seek summary judgment on Plaintiff's request for a declaration that the words "including after final determination of all adjustments" in N.C.G.S. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow (Count I), Plaintiff's Motion is GRANTED, and Defendants' Motion is DENIED.

4. To the extent the Summary Judgment Motions seek summary judgment on Plaintiff's request for a declaration that S&M Brands has established that the adjustments reached through the NPM Adjustment Settlements are sufficiently final to require the Attorney General to authorize a release of any overpayments S&M Brands made into its Escrow Fund for the sales years 2006–2017 (Count I), Plaintiff's Motion is GRANTED, and Defendants' Motion is DENIED.

5. To the extent the Summary Judgment Motions seek summary judgment on Plaintiff's request for a declaration that N.C.G.S. § 66-291(b)(2) requires that the calculation of S&M Brands' annual escrow overpayments be determined by considering S&M Brands' 1998 Market Share, or 125% of its 1997 Market Share, rather than treating such Market Share as nonexistent (zero) (Count I), Defendants' Motion is GRANTED, and Plaintiff's Motion is DENIED.

6. Accordingly, the Court issues the following declaration:

> The words "including after final determination of all adjustments" in N.C.G.S. § 66-291(b)(2) does not bar S&M Brands' request for a determination that it has made overpayments into escrow, and S&M Brands has established that the adjustments reached through the NPM Adjustment Settlements are sufficiently final to require the Attorney General to authorize a release of any

overpayments S&M Brands made into its Escrow Fund for the sales years 2006–2017.

7.     Except as specifically granted herein, the Summary Judgment Motions are DENIED.

SO ORDERED, this the 24th day of March, 2020.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases